## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

|  |  |
|---|---|
| LAQUITA OLIVER and CHERELLE JACOB, individually and on behalf of all others similarly situated, | Civ. No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** and **DEMAND FOR JURY TRIAL** |
| v. |  |
| NAVY FEDERAL CREDIT UNION, |  |
| Defendant. |  |

Plaintiffs Laquita Oliver and Cherelle Jacob ("Plaintiffs"), individually and on behalf of the other members of the below-defined class (the "Class") of similarly-situated applicants for residential loans, including original purchase mortgages, refinances, and other home mortgage loans such as Home Equity Lines of Credit ("HELOCs"), hereby allege against Defendant, Navy Federal Credit Union ("Navy Federal" or "Defendant"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

### I.      NATURE OF THE CASE

1.      This is a sadly familiar story. While the benefits of homeownership have long been recognized as the cornerstone of the American Dream—allowing people to gain access to credit and build equity, all while reducing housing costs—the home purchasing market has likewise been the site and source of pervasive racial discrimination.

2.      Historically, Black Americans were repeatedly and systematically denied access to the financial benefits of homeownership through race-based policies, such as the Federal Housing Administration's historic refusal to insure mortgages in and near so-called "minority

neighborhoods"—an outlawed practice now referred to as "redlining"—even while the FHA was subsidizing builders who mass-produced entire subdivisions for white Americans.

3.      Congress passed a number of laws in the 1960s in an attempt to eliminate race-based gatekeeping practices like "redlining." But despite the promise of this legislation, and many decades on, housing discrimination remains an ever-present problem, and minority applicants for home loans continue to be treated unfairly.  History may not quite repeat, but it does rhyme.

4.      A recently released bombshell report has shown that Navy Federal Credit Union ("Navy Federal"), the country's largest and most important credit union, systematically discriminates against would-be borrowers by race.

5.      Indeed, a White person in 2022 who applied for a conventional home loan purchase with Navy Federal had a 75% chance of being approved for the mortgage, while Black borrowers had less than a 50% chance of success.

6.      This disparity is the largest of any of the fifty largest home mortgage lenders in the United States and remains persistent even accounting for more than a dozen separate variables, including, among others, income, debt-to-income ratio, property value, downpayment percentage, and neighborhood characteristics. The study even revealed that Navy Federal approved a higher percentage of applications from White borrowers making less than $62,000 a year than it did from Black borrowers making $140,000 or more.

7.      When describing its corporate values, Navy Federal claims that it "champions community," and that it is "dedicated…to embracing and celebrating diversity and inclusion in all the communities" it serves. But Navy Federal's claims of community support are meaningless in the face of its actions: systematic discrimination in housing, in violation of federal law.

8.      Plaintiffs, like many others, sought home loans with Navy Federal. Plaintiffs, like many others, were denied because of their race, and suffered harm as a result.

## II.      <u>JURISDICTION AND VENUE</u>

9.      This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343, because Plaintiffs assert federal causes of action, because Plaintiffs assert civil rights causes of action, because at least one member of the Class is a citizen of a different state than Defendant, and because the amount in controversy exceeds $5,000,000.

10.     Personal jurisdiction is appropriate over Defendant because Navy Federal is headquartered in Virginia, transacts business in the State, and maintains a continuous and systematic presence there.

11.     Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b) because Navy Federal resides in the district, a substantial part of the events or omissions giving rise to the claims occurred in this district, and Navy Federal's principal place of business is in the district.

## III.      <u>PARTIES</u>

### A.      **Plaintiffs**

12.     Plaintiff Laquita Oliver is an African American 44-year-old resident of Miami Dade County, Florida, who sought and was denied approval for a mortgage with Navy Federal Credit Union in August 2023.

13.     Plaintiff Cherelle Jacob is an African American 40-year-old resident of Washington State who sought and was denied approval for a mortgage with Navy Federal Credit Union in October 2023.

**B.** **Defendant**

14. Navy Federal Credit Union is a global credit union headquartered in Vienna, Virginia. It is the largest retail credit union in the United States.

## IV. FACTUAL ALLEGATIONS

**A.** **Navy Federal and the Home Mortgage Industry**

15. Navy Federal, which was originally founded in 1933 as a resource for Navy employees, has become the largest credit union in the United States. Membership in the credit union is largely comprised of United States service members and their families, including, e.g., active duty members of the Army, Marine Corps, Navy, Air Force, Coast Guard, National Guard and Space Force, along with Department of Defense civilian personnel. As a credit union, Navy Federal is purportedly not for profit and produces dividends to its members. Navy Federal has approximately 13,000,000 members and more than $165 billion in assets.

16. A core portion of Navy Federal's business is mortgage origination and underwriting. Mortgage origination and underwriting refers to the process by which a bank determines whether it will lend money to a would-be buyer necessary to purchase the buyer's home.

17. According to its 2022 annual report, "Navy Federal closed almost 50,000 mortgage loans for a total of $16.5 billion" in 2022, and ended 2022 with a mortgage lending portfolio of $84.3 billion. Residential loans underwritten by Navy Federal include first and second lien mortgages, mortgage refinancings, and Home Equity Lines of Credit, each of which relies on similar factors for the determination of an applicant's creditworthiness.

**B.      Mortgage Rates Have Steadily Increased in the Last Two Years.**

18.     After a period of historically low mortgage rates, beginning in 2021 mortgage rates began a steady ascent. According to a study[1] by the St. Louis Federal Reserve, on or about December 31, 2020, the average 30-year fixed rate mortgage interest rate was 2.67%. By November 2022 the average 30-year fixed rate became 7.08%. As of November 30, 2023, the average rate was 7.22%.

19.     Navy Federal's denial of mortgages to minority applicants often denied those applicants the opportunity to take advantage of the period of historically low interest rates and kept many from attaining home ownership at all.

**C.      Because Of Navy Federal's Discriminatory Practices, Plaintiffs and Others Similarly Situated Were Denied Mortgages.**

20.     The statistics are damning. According to a recent study by CNN,[2] Navy Federal Credit Union approved 77% of the mortgage applications by White lenders, but only 56% of the applications from Latino applicants and 48% of the applications from Black applicants:



---

[1] https://fred.stlouisfed.org/series/MORTGAGE30US

[2] https://www.cnn.com/2023/12/14/business/navy-federal-credit-union-black-applicants-invs/index.html

21.     CNN's analysis covered approval rates for conventional, conforming home purchase mortgage loans for one-to-four unit properties that were intended to be used for a primary residence. The analysis was based on millions of mortgage applications analyzed to evaluate racial disparities in lending at Navy Federal and other lenders. The data was collected under the Home Mortgage Disclosure Act, which requires financial institutions to provide anonymized information on mortgage applications to the government, but mandates that the information provided include the applicants' race.

22.     The analysis also showed that this 29% approval gap between Black and White applicants is greater than any other large mortgage lender in the United States.

Gap in approval rates between Black and White applicants at Navy Federal and other large mortgage lenders in 2022

| | 0% | 25% | 50% | 75% | 100% |
|---|---|---|---|---|---|
| Navy Federal Credit Union | | | | | |
| Wells Fargo | | | | | |
| JPMorgan Chase | | | | | |
| Rocket Mortgage | | | | | |
| State Employees' Credit Union | | | | | |
| Bank of America | | | | | |

23.     Data analyzed included at least the following with respect to each mortgage application analyzed:

- The applicant's income;

- The applicant's debt-to-income ratio;

- The loan amount;

- The loan term;

- The loan-to-value ratio;

6

- The property value;

- The presence of a co-applicant;

- The applicant and co-applicant's sex;

- The credit scoring model used to generate the applicant's credit score;

- The primary applicant's age;

- The minority population percentage of the property's census tract;

- The median age of housing units in the property's census tract; and

- The difference between the median income of the metro area and the median income of the property's census tract.

24.     Even where each of the above variables was held constant, the disparity remained.

25.     As CNN explained, the "disparity remains even among White and Black applicants who had similar incomes and debt-to-income ratios. Notably Navy Federal approved a slightly higher percentage of applications from White borrowers making less than $62,000 a year than it did of Black borrowers making $140,000 or more":



**Black applicants had lower approval rates than those of other racial groups, at every income level**

Navy Federal Credit Union's loan approval rates for Black , Latino , Asian and White applicants by income in 2022

26.     To put it plainly: rich Black applicants were denied at greater rates than poor White applicants.

27.     As CNN explained, its "analysis found that Navy Federal had statistically significant racial disparities in its mortgage approval rates while holding constant more than a dozen different variables including the applicant's income and debt-to-income ratio, the loan amount, the property value, and the neighborhood's socioeconomic makeup. Even among applicants who were identical among all those variables, the analysis found, Black applicants were more than twice as likely to be denied as White applicants, and Latino applicants were roughly 85% more likely to be denied than White applicants."

28.     The disparity in mortgage approvals is not readily explainable by any variable other than bias. For example, while it is true that Black borrowers tend to have lower credit scores (in part due to the impact of historical discrimination and a relative lack of access to traditional

financial institutions), less than 25% of the applicants were denied for a purportedly problematic

credit history. As CNN explained:

> CNN's statistical analysis evaluated the likelihood of applicants of each racial and
> ethnic group being denied when more than a dozen other variables were held
> constant. The other variables, all of which are included in the HMDA dataset,[3]
> were: the applicant's income, the applicant's debt-to-income ratio, the loan amount,
> the loan term, the loan-to-value ratio, the property value, the presence of a co-
> applicant, the applicant and co-applicant's sex, the credit scoring model used to
> generate the applicant's credit score, the primary applicant's age, the minority
> population percentage of the property's census tract, the median age of housing
> units in the property's census tract, and the difference between the median income
> of the metro area and the median income of the property's census tract.

29.     There is no reasonable explanation for this disparity apart from racial

discrimination.

30.     While reporting indicated that Navy Federal's mortgage and loan approval process

is largely made by an automated underwriting systems, such automation does not guarantee non-

discrimination. Indeed, the algorithm itself is programmed to discriminate. Factors such as

education, zip code and a variety of "demographic information" can be treated as proxies for race.

How those factors are treated is of course up to Navy Federal. Other mortgagees employ

underwriting algorithms. Only Navy Federal has such a uniquely discriminatory result.

31.     For example, Fannie Mae changed its policy to make clear that a borrowers' rent

payment history will be a significant factor in determining mortgage approval—a recent change

that allowed 17% of loan applicants who otherwise would have been rejected to be approved for

their mortgage loan.[4] While Navy Federal claims to take "rental history" into account, it has

pointedly declined in response to CNN's questioning to provide any details regarding how such

---

[3] HMDA refers to the Home Mortgage Disclosure Act, an Act of Congress pursuant to which the Consumer
Financial Protection Bureau produces snapshot data regarding housing.

[4] https://therealdeal.com/national/2021/08/12/fannie-mae-to-count-rent-payments-toward-mortgage-
approval-process/

history could impact its underwriting process. In other words, despite the public criticism it faces, Navy Federal maintains secrecy over its residential loan algorithm.

32.     Despite that secrecy, what is clear is that Navy Federal's residential loan origination program has a discrimination problem.

33.     Plaintiffs experienced this discrimination firsthand.

34.     Plaintiff Cherelle Jacob is an African American, 40-year-old resident of Washington State. She has a Master's Degree and is employed as a teacher, and her husband is in the armed services. She and her husband together make approximately $200,000 in salary, have no debt, have ample savings, and both have "exceptional" credit scores above 800. They were attracted to banking with Navy Federal because of its convenience to military bases across the globe. In October 2023, they together sought a mortgage from Navy Federal to support the purchase of a modest family home.  The application was denied, distressing and upsetting Plaintiff Jacob.

35.     After the Navy Federal denial, Plaintiff Jacob and her husband were able to secure a mortgage for the same property from a mortgage broker. The mortgage broker they found was, for Plaintiff and her husband, less desirable than Navy Federal would have been because it lacked the convenience for service members purportedly offered by Navy Federal.

36.     Plaintiff Laquita Oliver is an African American, 44 year-old resident of Miami Dade County Florida. She works as a Capital Improvement Project Analyst, and had previously co-owned a small business. She makes approximately $100,000 per year in salary, has good credit, a history of home ownership, and very little debt. She applied for approval of a Navy Federal mortgage to support the purchase of a $400,000 home in August 2023.

37.     After a month-long application process – which included a hard pull of her credit that lowered her credit score and for which Navy Federal charged her a fee – she was denied

approval after approximately a months' wait.  When she complained, she was initially ignored and

then told that she could "appeal" the denial, but that such "appeal" would lead to yet another hard

pull of her credit. Rather than risk lowering her credit or incurring any additional fees, she gave

up on attaining a mortgage.

38.     Plaintiff Oliver is convinced that she should have qualified for the mortgage for

which she applied given her income and creditworthiness.

## V.     CLASS ACTION ALLEGATIONS

39.     Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and, as

applicable, Rule 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all

others similarly situated.

40.     Plaintiffs seek to represent the following class (the "Class"):

All minority residential loan applicants from 2018 through the present (the "Class
Period") who submitted an application for an original purchase or other home
mortgage loan through Defendant, who sought to refinance or modify a home
mortgage loan through Defendant, or who sought a Home Equity Line of Credit
from Defendant and whose application was:  (a) denied; (b) approved at higher
interest rates or subject to less favorable terms as compared to similarly situated
non-minority applicants; or (c) processed at a rate slower than the average
processing time of applicants submitted by similarly situated non-minority
applicants.

41.     Depending on the evidence developed during discovery, Plaintiffs reserve the right

to amend the definitions of the Class and and/or seek the certification of further subclasses based

on race, ethnicity, or the type of transactions at issue (e.g., original purchase mortgage loans,

refinancings, HELOCs).

42.     Excluded from the Class are Defendant, and any of Defendant's members,

affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial

officers, and their immediate family members; and Court staff assigned to this case.  Plaintiffs

reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

43.     This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

44.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Plaintiffs are informed and believe that, based on Defendant's share of the residential home loan market, there are thousands of Class members. The precise number of Class members is presently unknown to Plaintiffs, but may be ascertained from Defendant's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

45.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Defendant has acted in a manner generally applicable to Plaintiffs and each of the other members of the proposed Class. There is a well-defined community of interest in the questions of law and fact involved, which affect all Class members. The questions of law and fact common to the Class predominate over the questions that may affect individual Class members, including, among others:

   a.   Whether Defendant systematically discriminated against Class members based upon their minority status;

   b.   Whether Class members' applications for a first or second lien mortgage were denied where similarly situated non-minority applicants were approved;

c.  Whether Class members' applications to refinance a first or second lien loan were denied where similarly situated non-minority applicants were approved;

d.  Whether Class members' applications for a Home Equity Line of Credit were denied where similarly situated non-minority applicants were approved

e.  Whether Defendant's underwriting algorithms or machine learning programs were racially biased and led to unfairly discriminatory credit policies that harmed minority applicants;

f.  Whether the disparate impact of Defendant's policies was known to Defendant during the relevant time period, leading to the uniform disparate treatment of minority applicants;

g.  Whether Class members' residential loan applicants were processed at a rate slower than the average processing time for applicants submitted by non-minority applicants;

h.  Defendant's consumer disclosures and omissions;

i.  Defendant's internal approval processes;

j.  Defendant's appraisal policies;

k.  Whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

l.  The amount and nature of relief to be awarded to Plaintiffs and the other Class members.

46.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the other Class Members' claims because Plaintiffs and the other Class members were

subjected to the same allegedly unlawful conduct by Defendant and damaged in the same way. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices in which Defendant engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims.

47.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are an adequate Class representative because their interests do not conflict with the interests of the other Class members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

48.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for the members of the Class to individually seek redress for Defendant's wrongful conduct.  Even if Class members could afford individual litigation, such litigation creates a potential for inconsistent or contradictory judgments. It increases the delay and expense to all parties and the court system.  By contrast, a class action is suited and intended to manage such difficulties and provide the benefits of uniform and common adjudication, economy of scale, and comprehensive supervision.

49.     **Declaratory And Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other

Class members, thereby making declaratory relief appropriate, with respect to each Class as a whole. Plaintiffs also seek to represent the Class under Rule 23(b)(2) to obtain final injunctive relief forcing Navy Federal to cease and desist its current discriminatory practices.

50.     **Issue Certification – Federal Rule of Civil Procedure 23(c)(4).** As an alternative to Rule 23(b)(2) and/or 23(b)(3), Plaintiffs seek issue certification under Rule 23(c)(4) of liability issues common to all Class members.

## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF EQUAL CREDIT OPPORTUNITY ACT
### 15 U.S.C. § 16901, *et seq.*

51.     Plaintiffs, individually and on behalf of all others similarly situated, incorporate by reference Paragraphs 1–50, as though fully realleged herein.

52.     The Equal Credit Opportunity Act makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

53.     The Equal Credit Opportunity Act applies to applications for residential loans for original purchase mortgages and mortgage refinancing, along with credit provided through Home Equity Lines of Credit, like those of the Plaintiffs and the other Class members. Plaintiffs and each of the other Class members made such applications to Defendant.

54.     Defendant is a creditor because it regularly extends, renews, and continues issuances of credit.

55.     Defendant's consistent delays, roadblocks, feigned difficulties, and denials of residential loan applications including first and second mortgage loans, mortgage refinancings, and HELOCs constitute race-based discrimination forbidden by the Equal Credit Opportunity Act.

56.     Plaintiffs and the other Class members were harmed by Defendant's conduct.

57.     As a result of the foregoing, Plaintiffs, individually and on behalf of the other Class members, request the relief set forth below.

## COUNT TWO
### RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT OF 1968, 42 U.S.C. § 3601, *et seq.*

58.     Plaintiffs, individually and on behalf of all others similarly situated, incorporate by reference Paragraphs 1–50, as though fully realleged herein.

59.     The Fair Housing Act makes it unlawful to discriminate against designated classes of individuals in residential real estate transactions, including residential lending.

60.     Plaintiffs and the other Class members sought to engage in residential real estate transactions with Defendant.

61.     Plaintiffs and the other Class members are members of a protected class under the Fair Housing Act.

62.     Defendant discriminated against Plaintiffs and each of the other Class members by denying residential loan applications—including mortgages, refinancing transactions, and HELOCs—while granting said residential loan applications for similarly-situated White applicants.

63.     Defendant further discriminated against Plaintiffs and the other Class members by refusing to transact business with them during the Class Period, while, at the same time, transacting business with White applicants with similar qualifications.

64.     Plaintiffs and the other Class members were injured by Defendant's refusal to transact business with them because they paid application fees for residential loan applications that were delayed or denied, because they continued to pay higher interest rates, because they were

charged higher interest rates than similarly qualified applicants, and/or because their applications were denied.

65.     As a result of the foregoing, Plaintiffs, individually and on behalf of the other Class members, request the relief set forth below.

**COUNT THREE**
**RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**

66.     Plaintiffs, individually and on behalf of all others similarly situated, incorporate by reference Paragraphs 1–47, as though fully realleged herein.

67.     Under 42 U.S.C. § 1981, persons are guaranteed the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, as well as all other aspects of a contractual relationship.

68.     By seeking residential home loans including mortgages, refinances, and/or HELOCs from Defendant, Plaintiffs and the other Class members sought to "make and enforce" contracts with Defendant. Plaintiffs and the other Class members were denied their right to make and enforce contracts when Defendant offered to them terms less favorable than those offered to members of a different race, delayed or frustrated their application process, and/or by denying their applications.

69.     Plaintiffs and the other Class members were harmed by Defendant's denial of their rights to make and enforce contracts.

70.     As a result of the foregoing, Plaintiffs, individually and on behalf of the other Class members, request the relief set forth below.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgement in their favor and against Defendant, Navy Federal Credit Union, as follows:

A.     Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

B.     Finding that Defendant's acts described herein violate the Equal Credit Opportunity Act, the Fair Housing Act, and 42 U.S.C. § 1981;

C.     Awarding Plaintiffs and all others similarly situated restitutionary relief, together with compensatory and punitive damages;

D.     Ordering Defendant to reform loans and/or extend loans to minority applicants on the same terms afforded to non-minority applicants;

E.     Awarding Plaintiffs and others similarly situated injunctive and equitable relief;

F.     Awarding Plaintiffs and all others similarly situated prejudgment interest and attorneys' fees, costs, and disbursements; and

G.     Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated:  December 17, 2023

Respectfully submitted,


 /s/ John P. Pierce

18

John P. Pierce
**LILES PARKER PLLC**
2305 Calvert Street, NW
Washington, DC  20008
Telephone:  202-567-2050
jpierce@lilesparker.com

Adam J. Levitt
Daniel R. Schwartz
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dicellolevitt.com
dschwartz@dicellolevitt.com

Diandra Debrosse Zimmermann
Eli Hare
**DICELLO LEVITT LLP**
505 20th Street North, 15th Floor
Birmingham, Alabama  35203
Telephone: 205-855-5700
fu@dicellolevitt.com
ehare@dicellolevitt.com

Éviealle Dawkins
**DICELLO LEVITT LLP**
1101 17th Street NW, Suite 1000
Washington, DC  20036
Telephone:  202-975-2288
edawkins@dicellolevitt.com

Ben Crump
Sue-Ann Robinson
Chris O'Neal
Natalie Jackson
Nabeha Shaer
Desiree Austin-Holliday*
**BEN CRUMP LAW PLLC**
122 South Calhoun Street
Tallahassee, Florida  32301
Telephone:  850-224-2020
ben@bencrump.com
sueann@bencrump.com
chris@bencrump.com
natalie@bencrump.com
nabeha@bencrump.com
desiree@bencrump.com

*Counsel for Plaintiffs and the Proposed Class*