# United States District Court

## For The Eastern District of Virginia

| | | |
|---|---|---|
| LAQUITA OLIVER and CHERELLE JACOB, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **1:23-cv-01731-LMB-WEF** |
| NAVY FEDERAL CREDIT UNION, | ) ) | |
| Defendants. | ) ) | |

## MOTION TO INTERVENE

*NOW COMES*, intervenor (Gibbs) pursuant to FRCP, Rule 24(a) and moves to intervene as a matter of right. *Gibbs avers and incorporates each paragraph of Plaintiffs' complaint as if each paragraph is set forth verbatim*.

**PARTIES:**

1.     Plaintiff M. Eugene Gibbs, Esq. is an African American 77-year-old resident of Gwinnett County, Georgia, who has a credit score of 758; Gibbs sought and was denied approval for a refinance-mortgage with Navy Federal Credit Union in or about January 2022.

2.     Navy Federal Credit Union is a global credit union headquartered in Vienna, Virginia. It is the largest retail credit union in the United States.

3.     The USA by and through DOJ takes no position....

4.     Does 21-45....

PROPOSED AMENDED TITLE:

# United States District Court
## For The Eastern District of Virginia

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel.<br>M. EUGENE GIBBS-SQUIRES, Esq., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NAVY FEDERAL CREDIT UNION, and<br>DOES 1-25,<br><br>Defendants. | )<br>)<br>)<br>)<br>)  CIVIL ACTION NO.<br>)<br>)  **1:23-cv-01731**<br>)<br>)<br>)<br>)<br>) |

## I. PRELIMINARY STATEMENT

5.    To comply with Fed. R. Civ. P. 8(a) and the exacting standards of the Racketeering Influence Corrupt Organization Act (RICO) 18 U.S.C. § 1961, et seq., Gibbs states:

## II.    INDRODUCTION

6.    In or about 2009, the Navy Federal Credit Union (NFCU) joined and combined with known and unknown financial institutions to create a criminal enterprise in fact.

a.    Part and partial to the criminal enterprise, Navy Federal Credit Union (NFCU), denied 85% of legitimate applications made to modify loans – the dipropionate denials were Black applicants.

2

**MAKING HOME AFFORDABLE**

**HAMP Application Activity by Servicer [1]**
As of August 2017

| Servicer Name | Activity in August 2017 | | | Program-to-Date | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | # Requests Processed [2] | # Requests Approved [3] | # Requests Denied [4] | # Requests Received [2] | # Requests Processed [3] | # Requests Approved [4] | # Requests Denied [5] |
| Bank of America, NA | 196 | - | 196 | 1,525,914 | 1,505,172 | 588,284 | 916,888 |
| BankUnited | - | - | - | 9,959 | 9,959 | 4,970 | 4,989 |
| Bayview Loan Servicing, LLC | 24 | 11 | 13 | 92,548 | 92,371 | 20,911 | 71,460 |
| Carrington Mortgage Services, LLC | - | - | - | 105,590 | 105,590 | 27,443 | 78,147 |
| CCO Mortgage, a division of RBS Citizens NA | - | - | - | 39,479 | 39,479 | 7,041 | 32,438 |
| CIT Bank, NA [6] | 8 | - | 8 | 388,421 | 388,312 | 103,632 | 284,680 |
| CitiMortgage Inc | 427 | - | 427 | 614,846 | 612,419 | 194,698 | 417,721 |
| Ditech Financial LLC [7] | - | - | - | 131,064 | 131,064 | 50,828 | 80,236 |
| JPMorgan Chase Bank, NA | - | - | - | 1,853,776 | 1,847,897 | 455,099 | 1,392,798 |
| Nationstar Mortgage LLC | 82 | 1 | 81 | 635,579 | 635,578 | 134,794 | 500,784 |
| Navy Federal Credit Union | - | - | - | 16,222 | 16,222 | 2,509 | 13,713 |
| Ocwen Loan Servicing, LLC | 490 | 32 | 458 | 1,680,054 | 1,653,002 | 507,500 | 1,145,502 |
| ORNL Federal Credit Union | - | - | - | 824 | 824 | 66 | 758 |
| PennyMac Loan Services, LLC | 16 | - | 16 | 24,531 | 24,577 | 6,705 | 17,822 |
| PNC Bank NA [8] | - | - | - | 53,888 | 53,846 | 29,336 | 24,510 |
| Select Portfolio Servicing, Inc. | 1,697 | 325 | 1,372 | 304,057 | 294,701 | 139,382 | 155,319 |
| Specialized Loan Servicing LLC | - | - | - | 130,912 | 130,892 | 22,932 | 107,960 |
| U.S. Bank National Association | 48 | 48 | - | 161,867 | 161,801 | 49,524 | 112,277 |
| Wells Fargo Bank, NA | 138 | - | 138 | 1,620,184 | 1,611,146 | 455,124 | 1,156,022 |
| Other Servicers [9] | - | - | - | 212,677 | 212,504 | 111,096 | 101,408 |
| TOTAL | 3,126 | 417 | 2,709 | 9,602,392 | 9,527,306 | 2,911,874 | 6,615,432 |

[1] This report is sourced from the Monthly Servicer Survey of select servicers participating in MHA under a Servicer Participation Agreement. All data present in this report reflects what is provided by servicers participating in the survey and is not separately validated by Treasury. Servicers regularly perform evaluation and refinement of reporting, which can lead to updating of Program-to-Date results.

7.      Navy Federal Credit Union (NFCU), continuing criminal enterprise operated in violation of RICO has operated continuously from 2009 to 2022 – and continues unabated.

8.      Since 2009, Navy Federal Credit Union (NFCU) [**Hereinafter the HAMP-LESS GANG**] and other financial institutions have paid nearly $250 billion for the part they played in the housing crisis. Additionally, The HAMP-LESS GANG was "saddled" with $2 trillion due to [t]heir purchase of Merrill Lynch and Countrywide Financial. To recoup those loses, Bank of America joined and combined with NFCU, Nationstar Mortgage and other SERVICERS: forming a criminal enterprise [**HAMP-less Gang**] to defraud $1 trillion from more than 10 million Homeowners, the Treasury Department, Fannie Mae and Freddie Mac, and Fannie Mae and Freddie Mac Investors.

3

9.     In early 2009, The HAMP-LESS GANG took more than $45 billion in Government bailout money. As a condition of receiving this bailout, The HAMP-LESS GANG agreed to participate in the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers. The HAMP-LESS GANG signed a contract with the U.S. Treasury on April 17, 2009, agreeing to comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines.

10.    Though The HAMP-LESS GANG accepted billions of dollars and contractually agreed to comply with the HAMP directives and extend loan modifications to eligible homeowners, The HAMP-LESS GANG has systematically and deliberately worked to sabotage HAMP and to modify as few mortgages as possible according to its terms. The HAMP-LESS GANG found it was more profitable if homeowners accepted in-house modifications rather than the loan modifications mandated by the HAMP process.

11.    Rather than working diligently to reduce the number of loans in danger of default by establishing permanent modifications, The HAMP-LESS GANG serially strung out, delayed, and otherwise hindered the modification processes that it agreed to facilitate. The HAMP-LESS GANG's delay and obstruction tactics have taken various forms with the common result that

4

homeowners with loans The HAMP-LESS GANG serviced, and who met the requirements for participation in HAMP, did not get a fair opportunity to secure a permanent loan modification through the HAMP process.

12.    To accomplish its objectives, The HAMP-LESS GANG created a widespread RICO enterprise to defraud homeowners who sought modifications. The HAMP-LESS GANG enlisted NFCU, and unidentified Does to act as members of the RICO enterprise and assigned to NFCU key aspects of the process of administering HAMP, including interacting with homeowners seeking HAMP modifications, collecting and processing documents from homeowners, and corresponding with homeowners.

13.    The HAMP-LESS GANG worked for many years, to frustrate the HAMP process and to prevent as many homeowners as possible from obtaining permanent loan modifications that complied with HAMP while allowing the HAMP-LESS GANG to maintain the appearance to regulators and the public of trying to comply with its HAMP obligations.

14.    Through this relationship and with this common goal, The HAMP-LESS GANG, NFCU and Does known and unknown to Plaintiffs, formed an association-in-fact enterprise that was effectuated through the use of thousands of false wire and mail communications.

15.    As part of the scheme "site leaders" were told the HAMP-LESS GANG would collect more money if HAMP modifications were delayed and, as such, the

HAMP-LESS GANG employees were instructed to delay HAMP modifications.

16.     As part of the loan-modification scheme and enterprise, homeowners seeking HAMP trial plans were directed by wire and mail instructions from the HAMP-LESS GANG to send financial information directly to the Hamp-less Gang. Consumers were led to believe that they were dealing with NFCU when secretly they were communicating with the HAMP-LESS GANG or others.

17.     As part of the loan-modification scheme and enterprise, the HAMP-less Gang became "black holes" for documents sent by homeowners. As part of the enterprise and scheme, The HAMP-LESS GANG used the mail and wires to falsely deny modifications by claiming that information required of homeowners seeking a HAMP modification had not been received, when in fact the HAMP-less Gang had received the documents.

18.     Numerous former employees of the HAMP-less Gang report that NFCU directed its employees and contractors to use the wires and mails to deliberately lie to homeowners who were in the process of trying to obtain loan modifications under HAMP. They further report a widespread and deliberate practice of knowingly issuing false notices claiming that homeowners had failed to submit required documentation and of denying HAMP applications en masse for reasons they knew to be false. These actions were taken with the full knowledge, and at the direction, of the individuals tasked with running Defendants' HAMP modification program.

19.    This scheme was conducted via interstate mail and phone lines, in thousands of documents sent via mail and overnight courier, including documents and phone calls intended to deceive borrowers into believing they would receive HAMP modifications, and letters and phone calls which were knowingly false about why borrowers were not receiving HAMP modifications.

20.    Because of the HAMP-less Gang, millions of homeowners were wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans, and save their homes. By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts it formed with individual homeowners, The HAMP-LESS GANG has left millions of borrowers in a state of limbo – often worse off than they were before they sought a modification from the HAMP-LESS GANG.

21.    Individually and collectively, Gibbs states a cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) & (d), alleging that Defendants created an association-in-fact enterprise designed to mislead and deceive borrowers through use of the United States mail and wires.

22.    Gibbs seeks to "Claw Back" the hundreds of billions of dollars The HAMP-LESS GANG defrauded from the federal government in violation of the False Claims Act (FCA), 31 U.S.C. §§ 3729 – 3733.

23.    Gibbs seeks declaratory relief and/or a judgment of liability.

7

24.     In addition, on behalf of himself and statewide classes of similarly situated borrowers, Gibbs states claims of promissory estoppel for representations made to them by the HAMP-LESS GANG.

## A.     HAMP Was Created as a Clear, Streamlined Method for Borrowers to Modify Loans and Avoid Foreclosure

25.     In response to this foreclosure crisis, the federal government developed the Making Home Affordable ("MHA") program. HAMP was developed as a part of MHA to help keep homeowners in their homes by incentivizing mortgage servicers to modify the loan terms for borrowers who were delinquent or in danger of becoming delinquent on their loans.

26.     When President Obama announced HAMP on February 18, 2009, he described it as a plan to eliminate a "maze of rules and regulations" in which homeowners rarely find answers, and in which "your ability to restructure your loan depends on where you live, the company that owns or manages your loan, or even the agent who happens to answer the phone on the day that you call." The president announced that HAMP "establishes clear guidelines for the entire mortgage industry that will encourage lenders to modify mortgages on primary residences.... This will enable as many as 3 to 4 million homeowners to modify the terms of their mortgages to avoid foreclosure.

27.     The president described the shared responsibility under HAMP as follows:

*This will require both buyers and lenders to step up and do their part, to take on some responsibility. Lenders will need to lower interest rates and share in the costs of reducing monthly payments in order to prevent another wave of foreclosures. Borrowers will be required to make payments on time in return for this opportunity to reduce those payments. Borrowers will be required to make payments on time in return for this opportunity to reduce those payments.*[1]

28.     The HAMP program is administered by the U.S. Treasury Department ("Treasury"). All banks participating in the Troubled Asset Relief Program ("TARP") were required to participate in HAMP, while other banks could participate voluntarily.[2] BOA accepted over $45 billion in TARP bailout money.[3] The HAMP-less Gang thus signed a "Servicer Participation Agreement" with Treasury to participate in HAMP at its outset in April 2009.[4] As with all participating servicers, BOA was required to solicit certain borrowers to apply for HAMP assistance.[5]

29.     Servicers are restricted from initiating foreclosure or continuing previously initiated foreclosure processes against any properties with loans that are

---

[1]     Remarks by the President on the Home Mortgage Crisis, February 18, 2009; available at http://www.whitehouse.gov/the-press-office/remarks-president-mortgage-crisis

[2]     FED. RESERVE BANK OF ATLANTA ECON. REV., No. 2, at 6 (2010).

[3]     Officer of the Special Inspector General for the Troubled Asset Relief Program, Initial Report to the Congress, Feb. 6, 2009, http://www.sigtarp.gov/Quarterly%20Report/SIGTARP_Initial_Report_to_the_Congress.pdf, at 70.

[4]     *Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement,* http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/mha/Documents_Contracts_ Agreements/093010bankofamericahomeloansSPA(incltransmittal)-r.pdf; *Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement,* http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/mha/Documents_Contracts_Agreements/Bank%20of%20America%20NA.pdf.

[5]     U.S. Department of Treasury, *Making Home Affordable, Supplemental Directive 10-02*, Mar. 24, 2010 ("SD 10-02"), at 2-3.

eligible for HAMP but (i) have not been evaluated, (ii) are in the evaluation process, or (iii) are in an active Trial Period Plan.[6] The servicer must also coordinate with the mortgage insurer on the HAMP modification process for loans with mortgage insurance.[7]

30.     At the outset of HAMP in 2009, NFCU used a standard form agreement to offer Trial Period Plans to eligible homeowners. This agreement describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements. This Trial Period Plan was intended to, and did, induce homeowners to make trial payments and to expect that they would receive a permanent modification once they made all trial payments on time. However, as described at length below, pursuant to their loan-modification scheme and enterprise, NFCU intended to deny modifications to the "vast majority" of **BLACK** borrowers even if they complied with all the requirements set forth in the Trial Period Plans.

**B.     NFCU Used the HAMP-less Gang and others to Create the Modification Denial Enterprise and a Scheme Designed to Feign Compliance with HAMP while Permanently Modifying as Few Loans as Possible.**

---

[6]     *Id.* at 14; U.S. Department of Treasury, *Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages, Version 4.1* (Dec. 13, 2012), **https://www.hmpadmin.com/portal/programs/** docs/hamp_servicer/mhahandbook_41.pdf ("HAMP Handbook v4.1"), at 86-88.

[7]     Id. at 14.

1.      **The HAMP-less Gang decided it was more profitable to avoid HAMP modifications.**

31.      Under HAMP, the government incentivizes participating servicers by paying $1,000.00 for each HAMP modification. However, this incentive is countered by financial factors that make it more profitable for NFCU to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by the HAMP-less Gang because the HAMP-less Gang does not carry a significant risk of loss in the event of foreclosure.

32.      Economic factors that discourage the HAMP-less Gang from meeting its obligations under HAMP by facilitating loan modifications include the following:[8]

- The HAMP-less Gang may be required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

- The monthly service fee that the HAMP-less Gang, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently,

---

[8] See Thompson, Diane E., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior*, National Consumer Law Center (October 2009).

modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

- Fees that the HAMP-less Gang charges borrowers that are in default constitute a significant source of revenue. Aside from income the HAMP-less Gang receives directly, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.

- Fixed overhead costs involved in successfully performing loan modifications involve up-front costs to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

33.    Former HAMP-less Gang employees have confirmed that the HAMP-less Gang pressured them as a matter of policy to delay HAMP modifications in order to maximize fees for NFCU. According to Simone Gordon, a former HAMP-less Gang Senior Collector of Loss Mitigation, HAMP-less Gang supervisors, known

12

as "site leaders," regularly told the employees and "team leaders" they supervised that the more they delayed the HAMP modification process, the more fees the HAMP-less Gang would collect. Employees were regularly drilled that it was their job to maximize fees for the HAMP-less Gang by fostering and extending delay of the HAMP modification process by any means they could – this included by lying to customers.

## C.   The HAMP-less Gang and others fraudulently delayed and denied HAMP loan modifications.

34.   Former HAMP-less Gang employees have confirmed that the HAMP-less Gang is not complying with HAMP in a manner that can only be considered deliberate. HAMP-less Gang's general practice and culture is to string homeowners along with no intention of providing actual and permanent modifications. Instead, the HAMP-less Gang has put processes in place that are designed to foster delay, mislead homeowners, and avoid modifying mortgage loans.

35.   Former HAMP-LESS GANG employees recount that their supervisors instructed them to lie to customers and claim that the HAMP-less Gang had not received documents it had requested, and that it had not received trial payments (when in fact it had). For example, former employee Simone Gordon and her co-workers were repeatedly told by their supervisors that admitting that the HAMP-less Gang received documents would "open a can of worms" since the HAMP-less Gang was required to underwrite the loan modification within 30 days of receiving those documents, and it did not have sufficient underwriting staff to complete the

underwriting in that time. Former HAMP-LESS GANG underwriter and supervisor William Wilson confirmed that HAMP-less Gang underwriters had a backlog of files so large that they could not possibly complete underwriting within 30 or even 100 days of receiving a package of documents from any given homeowner. A former high-level HAMP-less Gang executive has described the HAMP-less Gang's underwriters as being grossly overloaded to the point that they could not have been expected to perform effective or accurate underwriting.

36.    HAMP-less Gang Site Leaders specifically ordered their employees to hold financial documents borrowers submitted for at least thirty days. Urban employees including Gregory Mackler, a former Customer Advocate who was promoted to a position of Quality Control, and Bert Sheeks, a former document auditor, similarly described how Urban would let documents from borrowers sit and age without acting on them – all with the full knowledge of the HAMP-less Gang executives who were supervising Urban. Once thirty days passed, the HAMP-less Gang would consider many of these documents, such as pay stubs or bank statements to be "stale" and the homeowner would have to re-apply for a modification.

37.    The HAMP-less Gang offered production goals to managers and to employees based on how many files they could "close" – meaning how many homeowners seeking loan modifications they could decline. The HAMP-less Gang awarded employees incentives such as $25 in cash or restaurant gift cards based on the number of files they could close in each week. On the other hand, employees

14

who did not close enough files were subject to discipline and possible termination. The HAMP-less Gang placed similar production goals and requirements on. The HAMP-LESS GANG former employees including Gregory Mackler and Bert Sheeks have described the intense pressure the HAMP-less Gang placed on NFCU and that NFCU supervisors placed on employees to close files as fast as possible.

38.    The HAMP-less Gang methodically carried out delay and rejection programs under the supervision of regional Vice Presidents and other executives including but not limited to Rebecca Mairone, John Berens, Kenneth Scheller, Troy Novotny, Patricia Feltch, and Tyrone Wells. The purpose of the mass denials was to reduce the volume of pending modification requests as quickly as possible while extending as few permanent modifications as possible.

**The HAMP-less Gang assigned key HAMP functions to third parties such as NFCU and others.**

39.    To appear to be compliant with HAMP, the HAMP-less Gang contracted with third parties to provide HAMP-related services. The HAMP-less Gang controlled and closely supervised these third parties, one of which was NFCU.

40.    The HAMP-less Gang identified NFCU as a participant and member of an enterprise whose purpose was to create a phony front whereby the HAMP-less Gang would offer borrowers the opportunity to receive a HAMP modification and thereby induce their response, but then reject a HAMP modification based on fraudulent pretenses of a homeowner's non-compliance.

41.     Thus, within weeks of committing to modify mortgages under HAMP by entering into an agreement with the Treasury Department, BOA contracted with the HAMP-less Gang whereby BOA assigned to the HAMP-less Gang key functions required to modify mortgage loans under the HAMP process.

42.     NFCU assigned the HAMP-less Gang specific tasks, and structured the arrangement so that NFCU received daily, or even hourly, updates on everything the HAMP-less Gang was doing with regard to HAMP. the HAMP-less Gang and NFCU interacted in a close relationship over which NFCU maintained strict and meticulous control. NFCU created this close contractual relationship in order to ensure that the HAMP-less Gang would participate in the loan-modification scheme and work with NFCU in an enterprise that has a common goal of reducing the number of HAMP modifications issued to borrowers.

43.     Among other things, NFCU assigned the HAMP-less Gang and others to analyze the data in a "pool" of loans to determine the preferred modification program based on BOA criteria and perform quality control on the data. Using NFCU's criteria, the HAMP-less Gang was to decide which modification program was appropriate." Often, this involved shifting a borrower who applied for a HAMP modification into a less advantageous, internal, NFCU modification that would be

44.     The HAMP-less Gang and others were to field telephonic inquiries from NFCU customers regarding the status of their loan modifications and strive to answer the customers' questions. NFCU also assigned The HAMP-less Gang the task of proactively notifying homeowners when required documents were missing.

16

To carry out the goal of the enterprise, NFCU created scripts that The HAMP-less Gang and others was to use for the calls.

45.     Former HAMP-less Gang employees and a former NFCU executive have confirmed that NFCU demanded, and The HAMP-less Gang provided, constant updates on virtually all aspects of work The HAMP-less Gang performed.

46.     The HAMP-less Gang and others was paid based on the volume of loan files it processed. It was irrelevant to the HAMP-less Gang's compensation whether it performed quality services to NFCU borrowers, or actually succeeded in permanently modifying borrowers' mortgages.

47.     HAMP-less Gang and others scanned and entered documents into multiple computer systems and scattered over various links in the systems such that a particular homeowner's application packet would appear incomplete to a regulator or auditor reviewing the file.

48.     HAMP-less Gang and others' employees reported the problems in the HAMP modification process on multiple occasions to NFCU executives.... These were the executives and employees designated by NFCU to oversee NFCU's HAMP loan-modification efforts. NFCU's performance did not improve and there were no efforts by NFCU to change NFCU's conduct or performance. Similarly, there were no substantial efforts by NFCU to bring its own performance into compliance with reasonable business practices or to remediate the harm its failings caused hundreds of thousands of its customers. NFCU continued on the same path, despite having full knowledge that it meant borrowers would be wrongfully denied, or delayed in

getting, permanent modifications.

### E.     The HAMP-less Gang directed and encouraged NFCU and others to fraudulently deny loan modifications.

49.     By secretly directing borrowers to return documents to the HAMP-less Gang and others' locations, NFCU used the HAMP-less Gang and others as a repository for borrower documents. In actual practice, and according to former HAMP-less Gang employees including Gregory Mackler and Bert Sheeks, along with former BOA supervisors Steven Cupples and William Wilson, NFCU designed the HAMP-less Gang to serve as a "black-hole" for the documents borrowers sent in the course of trying to obtain permanent loan modifications. The manner in which NFCU set up and directed HAMP-less Gang's and others' processes guaranteed that the vast majority of Trial Period Plan Agreements of **BLACK APPLICANTS** would not be converted to permanent modifications in the time contemplated by the Trial Period Plan Agreements and by HAMP.

50.     At NFCU's direction, HAMP-less Gang and others delayed forwarding modification packages to underwriting for months and instead noted on the computer system that documents were incomplete despite the fact that **BLACK APPLICANTS** had provided all required documents. Customers regularly heard nothing from NFCU for months after sending in their documents and making their required trial payments. When borrowers finally called to inquire as to the status of their modification, they were falsely strung along and told their loan was in process. Eventually most borrowers were falsely told that their file remained incomplete and

18

that they were required to send in additional documents. Typically, communications were over the phone, and were knowingly and intentionally deceptive in light of the HAMP-less Gang's and others' overall loan-modification scheme.

51.     Thus, the overwhelming majority of **BLACK APPLICANTS** who sought permanent modifications from the NFCU pursuant to HAMP were placed into a delay loop where they were falsely told via the wire or mail that their documents had not been received even if they had been and, if their documents were acknowledged, they were told they were too old and thus had to be resubmitted.

52.     This scheme was successful. The NFCU, and others fraudulently denied permanent modifications to tens of thousands of borrowers who had fulfilled the requirements of their Trial Period Plans.

**F.      The HAMP-less Gang and NFCU executives knew loan modifications were being fraudulently denied and encouraged the fraud to continue.**

53.     Executives of the HAMP-less Gang and NFCU were fully aware that thousands of **BLACK APPLICANTS** were being wrongfully denied HAMP modifications pursuant to the loan-modification scheme, yet they allowed, encouraged, and directed that the loan-modification scheme should continue unabated.

54.     Several former HAMP-less Gang employees including Gregory Mackler, Elizabeth Farmer, Shane Stahl, and Wesley White informed Beranich that the HAMP-less Gang was regularly closing borrower files wrongfully and detailed the ways in which files were being wrongfully closed. Beranich responded by

19

reminding employees who complained that their job was to reduce the number of service requests and that failure to do so could lead to them losing their jobs. On multiple occasions, employees who raised these types of concerns to Beranich were either fired or demoted.

55. The HAMP-less Gang employees who raised concerns to Beranich regarding the propriety of the manner in which service requests were closed were subject to discipline that included demotion or even termination.

### Notices provided by NFCU, the HAMP-less Gang and others were fraudulent.

56. The HAMP-less Gang knew and intended that they had created a "black hole" for homeowners seeking HAMP modifications, and that the overwhelming majority of **BLACK APPLICATIONS** would never receive permanent HAMP modifications.

57. The HAMP-less Gang knew and intended that, as a result of their scheme to delay and wrongfully deny modifications, the HAMP-less Gang would not provide permanent modifications under the terms of these contracts to **BLACK APPLICATIONS** who satisfied their obligations. NFCU also knew and intended that the vast majority of **BLACK APPLICATIONS**, who sought HAMP modifications, including those who received trial-payment agreements and satisfied their obligations, would instead be fraudulently denied a permanent modification on a falsified basis, or offered a permanent modification that did not comply with the terms of the contract.

20

58.     NFCU knew and intended that **BLACK APPLICATIONS** would rely on NFCU's representations that the HAMP-less Gang would provide a permanent modification on the terms offered, and **BLACK APPLICATIONS** did in fact rely on the fact that the NFCU had promised them permanent modifications upon fulfillment of the Trial Period Plan Agreement.

59.     NFCU and others sent documents to, and made false statements to, homeowners by means of interstate commerce, including but not limited the mails, telephone lines, email, and the internet. Such communications included letters instructing **BLACK APPLICATIONS** as to how to apply for HAMP modification; phone calls in which BOA and HAMP-less Gang employees knowingly misrepresented both the nature of the HAMP modification process and the status of borrowers' loan-modification applications; notices claiming that information or documents were missing; trial-payment; agreements; and notices of denial. Each of these documents was either fraudulent in themselves or sent with intent to further the enterprise's loan-modification scheme. In the aggregate, NFCU used interstate mail and wire hundreds of thousands (and possibly millions) of times in their loan-modification scheme to make representations that they knew, or would have known but for their recklessness, were deceptive, false, and fraudulent.

60.     NFCU contracted with other contractors to further its loan modification scheme. These contractors were retained to field telephone calls from customers attempting to secure HAMP modifications. Does NFCU retained to mail documents to **BLACK APPLICATIONS** seeking HAMP modifications and to

receive, compile, and upload documents from **BLACK APPLICATIONS**.

61.    NFCU's continuing criminal enterprise has existed uninterrupted from 2009 to today to maximize illegal profits gained by the continued discrimination perpetrated against Black applicants – to enhance some profits while disguising other losses.



**Net income of Navy Federal Credit Union from 2014 to 2022**
*(in billion U.S. dollars)*

| Year | Net income |
|------|-----------|
| 2014 | 0.72 |
| 2015 | 0.87 |
| 2016 | 1.2 |
| 2017 | 1.35 |
| 2018 | 1.55 |
| 2019 | 1.67 |
| 2020 | 0.81 |
| 2021 | 2.72 |
| 2022 | 1.9 |

Net income in billion U.S. dollars

**G.    NFCU's Actions Caused Injury to Plaintiffs**

62.    Plaintiffs have suffered injury caused by the scheme, including but not limited to **BANKRUPTCY**, longer loan payoff times, improper negative reporting to credit bureaus resulting in monetary harm due to damaged credit, monetary damages from higher principal balances, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, increased accrued interest, and **wrongful foreclosure**.

22

## III.   RICO VIOLATIONS

63.   Gibbs avers and incorporate paragraphs 6-63 as if each paragraph was set forth verbatim.

64.   Part and partial to NFCU's continuing criminal enterprise operated in violation of RICO, the HAMP-less Gang sold more than 10 million Homeowners' mortgage notes to Fannie Mae and Freddie Mac.

65.   NFCU and the HAMP-less Gang then created fraudulent Assignment of Mortgages with "other" SERVICERS to conceal the true ownership being Fannie Mae and Freddie Mac – to prevent Homeowners from applying for HAMP Modifications directly to Fannie Mae and Freddie Mac. AND,

66.   Conceal from Fannie Mae and Freddie Mac, that Homeowners were "criminally" denied modifications – lending to "troubled" mortgage notes NFCU and the HAMP-less Gang sold to Fannie Mae and Freddie Mac...**thus defrauding the US Government of one-trillion dollars: $1,000,000,000,000.00**.

67.   *Gibbs is informed and believes [h]e is entitled to an amount to be proven at trial; but not less than $400 million dollars: said damages to be up to 30% under the False Claims Act (FCA) and then and there treble pursuant to RICO.*

## IV.    PRAYER FOR RELIEF

**WHEREFORE**, Gibbs respectfully requests the following relief:

A.    GRANTING Gibbs' motion to Intervene;

B.    ORDERING the dissolution or reorganization of NFCU;

C.    Enter a judgment declaring the acts and practices of the HAMP-less Gang and NFCU, complained of herein to constitute fraud, perjury, subornation of perjury, obstruction of justice, and fraud on the courts, together with an award of monetary damages and other available relief on those claims;

D.    Pursuant to 18 USC § 1964 (a) and FRCP, Rule 65: Grant a temporary and/or permanent or final injunction enjoining the HAMP-less Gang and NFCU, their agents and employees, affiliates, and subsidiaries, from continuing to harm Gibbs and **BLACK APPLICANTS**. *Enjoin* NFCU from proceeding with *all illegal foreclosures*: including but not limited to Homeowners who proved [t]hey never missed mortgage payments.

E.    Order NFCU to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties and obligations under refinance, modifications, and mortgage applications;

F.    Award "Plaintiffs" the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

24

G. Award Gibbs an amount to be proven at trial; but not less than four-hundred million ($400,000,000) dollars: 30% under the False Claims ACT (FCA); AND treble damages pursuant to RICO;

H. Gibbs, and Plaintiffs DEMAND a JURY TRIAL on all issues permitted by law; and,

I. The Court GRANTS such other and further relief this Court deems just and proper, at law and equity, general or special, to which Gibbs and *Plaintiffs* have shown themselves justly entitled.


Respectfully Submitted,


M. Eugene Gibbs, Esq., Pro-se
3108 Hidden Falls Drive
Buford, Georgia 30519
(843) 610-0674
mgibbs70@aol.com

## CERTIFICATE OF SERVICE

I, M. Eugene Gibbs, hereby certify that a copy of Gibbs' Motion to Intervene was served electronically this 31st day of January 2024, addressed to:

alevitt@dicellolevitt.com, ben@bencrump.com, dschwartz@dicellolevitt.com, fu@dicellolevitt.com, ehare@dicellolevitt.com, edawkins@dicellolevitt.com, jpierce@LilesParker.com, cyakubisin@phelanpetty.com, jpetty@phelanpetty.com, gabramson@milberg.com, sharris@milberg.com, michael.dunn@milberg.com, andre.manuel@wilmerhale.com, jonathan.paikin@wilmerhale.com, karin.dryhurst@wilmerhale.com, michaela.wilkesklein@wilmerhale.com, ronald.machen@wilmerhale.com, thais.ridgeway@wilmerhale.com

M. Eugene Gibbs, Esq.
843-610-0674
mgibbs70@aol.com