**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| *In re: Navy Federal Mortgage Discrimination Litigation* | Civ. No. 23-cv-01731<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Bob Otondi, Dennis Walker, Charles Gardner, Marie Pereda, Laquita Oliver, John Jackson, Carl Carr, Constantina Batchelor, and Christina Hill (collectively, "Plaintiffs"), individually and on behalf of the other members of the below-defined class (the "Class") of similarly-situated applicants for residential loans, including original purchase mortgages, refinances, and other home mortgage loans such as Home Equity Lines of Credit ("HELOCs"), for their Consolidated Class Action Complaint, hereby allege against Defendant, Navy Federal Credit Union ("Navy Federal" or "Defendant"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I.      NATURE OF THE CASE

1.      Navy Federal systematically discriminates against African Americans, Latinos, Native Americans, and other racial minorities by denying mortgage applications that would have been approved for similarly situated White Americans.

2.      As Navy Federal's *own data* show, in 2022, it denied Black borrowers' home loan applications at a rate of 52% and Latino borrowers' applications at a rate of 44%, while it only denied 23% of White applicants' applications.

3.      In fact, Navy Federal approved a higher percentage of applications from White borrowers making less than $62,000 a year than it did from Black borrowers making $140,000 or more per year.

4.      As a December 2023 third-party analysis of Navy Federal's data explained, even when controlled for other variables, the racial disparities were vast:

> Navy Federal had statistically significant racial disparities in its mortgage approval rates while holding constant more than a dozen different variables including the applicant's income and debt-to-income ratio, the loan amount, the property value, and the neighborhood's socioeconomic makeup.
>
> Even among applicants who were identical among all those variables, the analysis found, Black applicants were more than twice as likely to be denied as White applicants, and Latino applicants were roughly 85% more likely to be denied than White applicants.[1]

5.      Data from 2018-2022 reveal a similar result. Together, Navy Federal's own data reflect one clear and unmistakable conclusion:  Navy Federal—the nation's largest credit union, with more than $165 billion in assets and 13,000,000 members—systemically and intentionally discriminates against minority borrowers across the United States.

6.      With home ownership serving as the traditional foundation of a stable, middle-class life and for building intergenerational wealth, Navy Federal's practices deny minority borrowers access to the American dream. Navy Federal's customer base also primarily consists of active-duty military, military families, and veterans, meaning that when Navy Federal discriminates, it is the current and former members of the armed forces—and their families—who are harmed.

---

[1] Casey Tolan *et al*., "The nation's largest credit union rejected more than half of its Black conventional mortgage applicants," CNN BUSINESS (Dec. 14, 2023), https://www.cnn.com/2023/12/14/business/navy-federal-credit-union-black-applicants-invs/index.html.

7.      Plaintiffs' experiences are instructive. Bob Otondi is an immigrant from Kenya, business owner, Armed Forces family-member, and Texas resident who found his dream home in a Dallas suburb in 2021. He had no significant debt, very good credit, and the ability to put 20% down. After a lengthy application period and significant delay, Navy Federal denied his application shortly before he was to close on that home. Mr. Otondi had to scramble: ultimately, in a matter of weeks, he was able to secure a mortgage from Service First Mortgage Company. However, the mortgage was for a higher rate than he would have paid with Navy Federal. He was qualified for the Navy Federal loan and should not have had to endure the emotional distress and expense of finding an alternative at the last second and at a higher cost.

8.      Plaintiff Carr, who is Black, had to do more than just scramble. A former member of the Navy, longtime Navy Federal member, and now 35-year veteran of the United States Postal Service, Mr. Carr sought to buy a home in North Carolina. He and his wife, who is also Black, rented a home in North Carolina while searching for a house to purchase. In November 2021 they found their dream home in Greenville, North Carolina, and had their purchase offer accepted. They applied for a VA loan for which they were clearly qualified: they earned more than $130,000 annually and had minimal outstanding debt. Due to Navy Federal's delays, the closing date for the purchase of the home was delayed on multiple occasions. Finally, approximately two days before closing, Navy Federal suddenly denied their mortgage application. Following the denial, the seller told Plaintiff Carr they would no longer be willing to sell. Mr. Carr wrote to Navy Federal in January 2022 saying he thought he had been discriminated against based on race. Navy Federal said there was no "evidence of discrimination on file" and did not provide further assistance. In the meantime, Plaintiff Carr's and his spouse's lease expired, they lost their earnest money deposit on their dream home, and were forced to find a different home. Plaintiff Carr ultimately obtained

a mortgage loan on a different, *more expensive* home from another lender. The new home is less desirable than the one they sought to have underwritten by Navy Federal, even though it was more costly. Plaintiff Carr was distraught and upset by the experience, and incurred substantial monetary losses.

9.      Both Plaintiffs Otondi and Carr should have been issued home loans by Navy Federal. Indeed, other mortgage lenders agreed, as each ultimately secured another loan albeit at greater cost. They were qualified, and there was no good reason to deny them.

10.     But like it did to so many others, Navy Federal denied Plaintiffs Otondi and Carr their loans. The reason is clear: their race.

11.     The problem goes deeper. When Navy Federal *does* approve non-White borrowers, it does so on terms that are often worse than similarly situated White applicants. Navy Federal's regulator, the National Credit Union Administration ("NCUA"), recently analyzed credit union lending to determine not only whether there is discrimination in a decision to lend, but also whether there is discrimination in the interest rates that characterize those loans.[2] Navy Federal, as the largest credit union by orders of magnitude, necessarily dominated the data set NCUA analyzed.

12.     The result was astounding: Black and Latino mortgage applicants to credit unions like Navy Federal pay much higher interest rates than similarly situated White applicants.[3] This was Plaintiff Constantina Batchelor's experience. A Black woman who applied to Navy Federal for a mortgage loan in November 2023, Plaintiff Batchelor closed on a loan with Navy Federal in

---

[2] NCUA Office of the Chief Economist Research Note (hereinafter "NCUA Research Note"), "Observations on Credit Unions' Mortgage Lending to Minority Borrowers," https://ncua.gov/files/publications/analysis/observations-credit-unions-mortgage-lending-minority-borrowers.pdf.

[3] *Id*. at 3.

December 2023 with an 8% interest rate. At the time, the average interest rate for such loans was approximately 7%. Plaintiff Batchelor earns more than $140,000 annually and had a credit score of over 700. She should not have been charged an inflated interest rate.

13.    Perhaps Navy Federal's actions should not be surprising. Indeed, even a brief review of its website makes clear that Navy Federal is not serious about lending to non-White borrowers or protecting its members against discrimination. For example, as of February 5, 2024:[4]

- While the front page of Navy Federal's website has a hyperlink to purported information regarding its status as an "equal housing lender," clicking that hyperlink leads to *no* information regarding equal lending, and instead to a document relating to Navy Federal's investment services "cash sweep program."

- While the front-page of Navy Federal's website has a claim to be an "Equal Opportunity Employer" along with a purported hyperlink for more information, the hyperlink is non-operational.

- And, remarkably in 2024, Navy Federal makes clear on the front page of its website that "Navy Federal conducts all member business in English. All origination, servicing, collections, and marketing materials are provided in English only."

14.    Each of these facts remained prominently featured on Navy Federal's website over a month after Plaintiffs first sued Navy Federal for its discriminatory practices, and more than a month after Navy Federal put out a press release claiming it "take[s] our responsibility to fair

---

[4]    *See* Navy Federal Website (Feb. 5, 2024), https://web.archive.org/web/20240205105424/https://www.navyfederal.org/.

lending very seriously."[5] Indeed, all of these indicia of intentional discrimination—the English-only policy statement, the broken hyperlink regarding equal opportunity, and the equal housing lender link that leads to a cash-sweep brochure—appeared on the very press release containing Navy Federal's protest that it does not discriminate.

15.     Navy Federal has maintained a pattern and practice of disdain for its own members—with this racial discrimination just the latest example. Recently, Navy Federal paid $28.6 million to settle shocking claims of abuse against its members, wherein Navy Federal—in aid of debt collection—was found to have made it a policy to threaten to report servicemembers' purported debts to the servicemembers' commanding officers, despite having zero authorization to report such items up the so-called chain of command.[6] Navy Federal may drape itself in the flag, but its actions show a base contempt for those it purportedly serves.

16.     Plaintiffs bring this putative class action against Navy Federal to hold it accountable for its unlawful discrimination, to stop its discriminatory practices, and to ensure that the injured Class members receive the actual, punitive, exemplary, and statutory damages to which they are entitled.

17.     When describing its corporate values, Navy Federal claims that it "champions community," and that it is "dedicated…to embracing and celebrating diversity and inclusion in all

---

[5] Navy Federal Press Release, "Navy Federal Credit Union Responds to Allegations Concerning Its Home Lending Practices," (Dec. 18, 2023), https://web.archive.org/web/20240113113042/https://www.navyfederal.org/about/press-releases/2023/navy-federal-responds-to-home-lending-allegations.html.

[6] Consumer Financial Protection Bureau Newsroom, "CFPB Orders Navy Federal Credit Union to Pay $28.5 Million for Improper Debt Collection Actions," (Oct. 11, 2016), https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-navy-federal-credit-union-pay-285-million-improper-debt-collection-actions/#:~:text=The%20practices%20violated%20the%20Dodd,unless%20they%20made%20a%20payment.

the communities" it serves.[7] Of course, actions speak louder than words, and Navy Federal's claims of community devotion ring hollow in the face of its systemic discrimination against non-White borrowers.

## II.    JURISDICTION AND VENUE

18.    This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343, because Plaintiffs assert federal causes of action, because Plaintiffs assert civil rights causes of action, because at least one member of the Class is a citizen of a different state than Defendant, and because the amount in controversy exceeds $5,000,000.

19.    Personal jurisdiction is appropriate over Defendant because Navy Federal is headquartered in Virginia, transacts business in the State, and maintains a continuous and systematic presence here.

20.    Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b) because Navy Federal resides in the District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and Navy Federal's principal place of business is located in Vienna, Virginia, which is in this District.

## III.    PARTIES

**A.    Plaintiffs**

21.    Bob Otondi is a Black resident of Grand Prairie, Texas, who sought and was denied approval for a mortgage with Navy Federal Credit Union in 2021.

22.    Dennis Walker is a Black resident of Fort Lauderdale, Florida, who applied for and was denied a refinance of a home loan with Navy Federal in December 2021.

---

[7]    Navy   Federal   Website,   "About   Navy   Federal   Credit   Union", https://www.navyfederal.org/about.html.

23.     Constantina Batchelor is a resident of Glen Burnie, Maryland, who closed on a home loan with Navy Federal in December 2023. While average interest rates at that time of year were approximately 7%, Ms. Batchelor's Navy Federal interest rate stands at 8%.

24.     Charles Gardner is a Black resident of Port Saint Lucie, Florida, who was denied approval for a mortgage loan with Navy Federal Credit Union in 2023.

25.     Laquita Oliver is a Black resident of Miami, Florida, who was denied a mortgage loan with Navy Federal in August 2023.

26.     Christina Hill is a Black resident of San Diego, California, who was denied a mortgage loan with Navy Federal in November 2021.

27.     Marie Pereda is a Hispanic resident of Temecula, California, who was denied a mortgage loan with Navy Federal in August 2022.

28.     John Jackson is a Black resident of Gainesville, Florida, who was denied a mortgage loan with Navy Federal in September 2023.

29.     Carl Carr is a Black resident of North Carolina, who was denied a mortgage loan with Navy Federal in September 2022.

**B.    Defendant**

30.     Navy Federal Credit Union is the largest credit union in the United States, with more than 13,000,000 members, more than $165 billion in assets, and more than 14,000 employees. Navy Federal is headquartered in Vienna, Virginia, and is chartered and regulated under the authority of the NCUA.

31.     Navy Federal was founded on January 17, 1933, by seven Department of Navy employees, and, since that time, its growth has been entirely tied to the unique relationship of trust that Navy Federal claims to have built with members of the Armed Forces and their families.

Indeed, to this day, Navy Federal's membership is limited to servicepeople and their families: "[t]o become a member, you or one of your family or household members must have ties to the armed forces, DoD or National Guard."[8] Navy Federal states that it wishes to "[b]e the most preferred and trusted financial institution serving the military and their families."[9] In its company biography on X (formerly Twitter),  Navy Federal uses martial language, stating that: "Army, Marine Corps, Navy, Air Force, Coast Guard, Space Force, Veterans and their families—Our Members are the mission." According to its annual report, Navy Federal spends over $100 million a year on advertising, with ad campaigns playing-up its relationship with the military, relying on imagery that evokes active-duty service, and prominently featuring Black servicemen and women:



---

[8] Navy Federal Website, "Become a Member," https://www.navyfederal.org/membership/become-a-member.html.

[9] Navy Federal Website, https://www.navyfederal.org/.



32.     Approximately 43% of the 1.3 million men and women on active duty in the United States military are people of color,[10] as is approximately 26% of the veteran population.[11]

33.     Indeed, Navy Federal has locations on military bases throughout the world—a relationship that is only poised to grow. On September 25, 2023, Navy Federal announced that the Department of Defense had awarded it a contract to operate the "Overseas Military Banking Program" (OMBP), a program established after World War II to provide active-duty service

---

[10] Amanda Barrroso, "The changing profile of the U.S. military: smaller in size, more diverse, more women in leadership" Pew Research Center (Sept. 10, 2019), https://www.pewresearch.org/short-reads/2019/09/10/the-changing-profile-of-the-u-s-military/#:~:text=A%20look%20at%20the%20racial,black%20and%2016%25%20were%20Hispanic.

[11] Katherine Schaeffer, "The changing face of America's veteran population," Pew Research Center (Nov. 8, 2023), https://www.pewresearch.org/short-reads/2023/11/08/the-changing-face-of-americas-veteran-population/.

members with financial and cash services. Under this contract alone, Navy Federal will operate 60 banking facilities and 275 ATMs across Europe and the Pacific.[12]

34.     Arguably, no financial institution has done more than Navy Federal to attempt to place itself in a position of trust with service members and their families. Navy Federal provides banking services for its members across the United States and on military bases around the world, including a suite of home loan offerings, such as first and second lien residential mortgages, residential mortgage refinancings, and home equity lines of credit ("HELOCs").

## IV.     FACTUAL ALLEGATIONS

### A.     Home Ownership Is the Foundation of the American Dream.

35.     Home ownership has long been considered a cornerstone of the American Dream and one of the surest paths to a financially secure life in this country.

36.     As Habitat for Humanity recently put it, "homeownership promotes wealth building by acting as a forced savings mechanism and through home value appreciation."[13]  The impacts are generational, as "[c]hildren of homeowners transition to homeownership earlier—lengthening the period of which they can accumulate wealth—and have homeownership rates 25 percentage points higher than the rate of children of renters."[14]

---

[12] Navy Federal Press Release, "Navy Federal Credit Union Awarded Contract to Operate Department of Defense Overseas Military Banking Program," https://www.navyfederal.org/about/press-releases/2023/navy-federal-awarded-contract-to-operate-dod-overseas-military-banking-program.html#:~:text=(September%2025%2C%202023)%20%E2%80%94,active%2Dduty%20servicemembers%20and%20on%2D.

[13] Habitat for Humanity Evidence Brief, "Research Series: How does homeownership contribute to wealth building?" (Dec. 2020), https://www.habitat.org/media/3371/download.

[14] Id.

37.     Consistent with these benefits, the United States has promoted and subsidized access to home ownership. In the 1800s and 1900s, the Homestead Act was used to promote the United States' western expansion, and provided opportunity for families to acquire between 160 and 640 acres of land for free, as long as the family lived on the acquired land.

38.     Similarly, in the 1930s, amid the Great Depression, the Federal Housing Administration ("FHA") was created to subsidize and promote the development of additional housing throughout the United States. After World War II, the Servicemen's Readjustment Act of 1944, a/k/a the G.I. Bill, provided millions of returning veterans access to cheap, subsidized mortgages to purchase homes.

39.     While these housing policies led to much of the modern American middle-class life, they also have a darker legacy: discrimination against non-White Americans was often baked into the otherwise vital legislation. For example, the Homestead Act was available to free men only, used to "settle" Native American land, and, in practice, extended benefits almost exclusively to Whites, even after slavery ended. When the FHA subsidized the development of new neighborhoods in the 1930s, 40s, and 50s, it did so with the express requirement that "none of the homes be sold to African Americans."[15] Further, the FHA refused to insure mortgages in or near African American neighborhoods—a policy known as "redlining."[16]

---

[15] Terry Gross, "A 'Forgotten History' Of How The U.S. Government Segregated America," NPR (May 3, 2017), https://www.npr.org/2017/05/03/526655831/a-forgotten-history-of-how-the-u-s-governmentsegregated-america.

[16] *Id.*

40.     Likewise with the G.I. Bill: while White veterans benefited greatly, the United States was still segregated when that bill became law, meaning Black veterans were excluded from many of its benefits.[17]

**B.     While White America Benefited from These Policies, Racial Minorities Had the Door to the American Dream Slammed Shut.**

41.     In 1968, as part of a raft of Civil Rights legislation, Congress passed the Fair Housing Act of 1968, a marked shift in policy away from legally sanctioned discrimination. The Fair Housing Act makes it "unlawful for any person or other entity…engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a).

42.     In 1973, The Equal Credit Opportunity Act ("ECOA") was passed to further address bias in the extension of credit by expanding the Fair Housing Act's protections to prohibit discrimination in any aspect of a credit transaction.  Regulation B, the ECOA's enacting regulation, contains specific procedural requirements that financial institutions like Navy Federal must follow. The procedural requirements include that financial institutions notify applicants of a credit decision within 30 days of receiving a completed application, collect information about an applicant's race and other personal characteristics, and provide an applicant an "adverse action notice" whenever there is a refusal to grant credit "in substantially the amount or on substantially the terms requested in an application…" 12 C.F.R. § 1002.2(c)(1)(i). The ECOA mandates strict

---

[17] Quill Lawrence, "Black vets were excluded from GI bill benefits – a bill in congress aims to fix that," NPR (Oct. 18, 2022), https://www.npr.org/2022/10/18/1129735948/black-vets-were-excluded-from-gi-bill-benefits-a-bill-in-congress-aims-to-fix-th#:~:text=Music%20Of%202023,Black%20vets%20were%20excluded%20from%20GI%20bill%20benefits%20%E2%80%94%20a%20bill,and%20came%20home%20to%20segregation.

adherence to the form of the adverse action notice, and that it contain certain information including, inter alia, a statement of specific reasons for the actions taken.

43.     The ECOA and Regulation B have also created incentives for financial institutions to conduct regular assessments of their fair lending practices and to proactively take corrective measures with respect thereto. *See* 12 U.S.C. § 1691c-1; 12 C.F.R. § 1002.15.

44.     In 1975, the Home Mortgage Disclosure Act (HMDA) was enacted, which required the collection, reporting, and disclosure of data related to home mortgage applications. The data include the disposition of each application for mortgage credit; the type, purpose, and characteristics of each home mortgage application or purchased loan; the census-tract designations of the properties; loan pricing information; demographic and other information about loan applicants, including their race, ethnicity, sex, and income; and information about loan sales. This data is frequently called "HMDA Data." The purpose of the law was "to assist in determining whether financial institutions are serving the housing needs of their local communities; facilitate public entities' distribution of funds to local communities to attract private investment; and help identify possible discriminatory lending patterns."[18] HMDA Data is readily available.

**C.     Using Big Data to Identify Mortgage Lending Discrimination in the 21st Century.**

45.     The Home Mortgage Disclosure Act was amended by the 2010 Dodd–Frank Wall Street Reform and Consumer Protection Act to require lenders to provide certain data to the Consumer Financial Protection Bureau ("CFPB"). Certain fields in the HMDA Data are made publicly available through the CFPB's website: https://www.consumerfinance.gov/data-research/hmda/. In 2015, the CFPB issued a rule amending existing regulations to include new

---

[18] Consumer Financial Protection Bureau, "An Updated Review of the New and Revised Data Points in HMDA," at 4 (Aug. 2020), https://files.consumerfinance.gov/f/documents/cfpb_data-points_updated-review-hmda_report.pdf.

data points in the HMDA Data, revise existing HMDA Data points, and increase mandatory reporting of additional loan types. The changes were fully implemented for the 2018 HMDA Data.

46.     Everyone has access to this data, meaning that mortgage lenders who wish to analyze their own lending practices can easily do so.

47.     But, despite the promise of the legislation, and despite the ability for mortgage lenders to self-assess, differential mortgage lending based on race remained a persistent problem.

48.     This is a well-known issue in the industry, and has been studied consistently since the Fair Housing Act's passage. For example, in a working paper produced by the Federal Reserve Bank of Boston in 1996, the authors determined that "even after controlling for financial, employment, and neighborhood characteristics, Black and Hispanic mortgage applicants [were] roughly 60% more likely to be turned down than whites," and that this "statistically significant gap" was "associated with race."[19]

49.     Roughly ten years later, in a December 2005 Brookings Institution study authored by former Assistant Secretary of Housing and Urban Development William C. Apgar, Secretary Apgar described a "dual market" for mortgages, with more expensive loan products offered to Black and Latino applicants than standard "prime" loans offered to Whites.[20] As Assistant Secretary Apgar explained:

> Although it is more subtle than the neighborhood redlining of the past, the dual market structure of the current mortgage industry nevertheless still denies lower-income minorities equal access to prime mortgages. By pushing higher-cost and more default-prone subprime mortgages, the dual market steals scarce resources

---

[19] Alicia H. Munnell *et al.*, "Mortgage Lending in Boston: Interpreting HMDA Data," 86 THE AMERICAN ECONOMIC REVIEW 1, 25-53 (March 1996).

[20] William C. Apgar and Allegra Calder, "The Dual Mortgage Market: The Persistence of Discrimination in Mortgage Lending," Joint Center for Housing Studies, Harvard University (Dec. 2005), https://jchs.harvard.edu/sites/jchs.harvard.edu/files/w05-11.pdf.

from some of the nation's most vulnerable residents and works to further destabilize some of the nation's most distressed neighborhoods.[21]

50.     Assistant Secretary Apgar's words were prescient. The subprime implosion in 2008 decimated minority neighborhoods, a harm that would linger years after the larger rebound in the housing market.[22] Notably, on average, Hispanic families lost up to 50 percent of their wealth and Black families up to 34 percent of their wealth during the Great Recession, while White families lost just 10 to 13 percent.[23]

51.     In one study of home loans in 2019, authors held "17 different factors steady in a complex statistical analysis of more than two million conventional mortgage applications for home purchases," and found that lenders "were 40 percent more likely to turn down Latino applicants for loans" and "80 percent more likely to reject Black applicants than similar White applicants." As they put it, "[i]n every case, the prospective borrowers of color looked almost exactly the same on paper as the White applicants, except for their race."[24] Recent scholarship has also explained

---

[21] *Id.*

[22] Kimberly Blanton, "Subprime Crisis Lingers for Minorities," Center for Retirement Research at Boston College (Oct. 2, 2018), https://crr.bc.edu/subprime-crisis-lingers-for-minorities/.

[23] Signe-Mary McKernan, *et al.*, "Impact of the Great Recession and Beyond: Disparities in Wealth Building by Generation and Race," URBAN INSTITUTE (April 2014) https://www.urban.org/sites/default/files/alfresco/publication-pdfs/413102-Impact-of-the-Great-Recession-and-Beyond.PDF at 3.

[24] *See* Emmanuel Martinez and Lauren Kirchner, "The Secret Bias Hidden in Mortgage-Approval Algorithms," The Markup (Aug. 25, 2021), https://themarkup.org/denied/2021/08/25/the-secret-bias-hidden-in-mortgage-approval-algorithms.

that purportedly neutral factors, such as "credit score," are hopelessly infected with racial bias and often overweighted by financial institutions.[25]

52.    Recent studies have likewise identified mortgage-loan discrimination as a persistent issue requiring constant vigilance on the part of lending institutions, even where the mortgage lending is "automated" based on what financial institutions claim are race-neutral criteria. According to a November 2019 analysis by Bartlett, *et al.* of mortgage interest rates, despite purportedly race-neutral criteria "Latinx and African-American borrowers pay 7.9 and 3.6 basis points more in interest for home-purchase and refinance mortgages, respectively, because of discrimination," *leading to a yearly cost to such borrowers of $765 million in extra interest per year*.[26]

53.    The reason, as recent studies have shown, is that the automated processes now typically used to evaluate home loans are subject to bias.

54.    As the Brookings Institute recently explained, the nation's history of systemic discrimination has infected our modern use of algorithms to make economic decisions:

> For centuries, laws and policies enacted to create land, housing, and credit opportunities were race-based, denying critical opportunities to Black, Latino, Asian, and Native American individuals. Despite our founding principles of liberty and justice for all, these policies were developed and implemented in a racially discriminatory manner. Federal laws and policies created residential segregation, the dual credit market, institutionalized redlining, and other structural barriers. Families that received opportunities through prior federal investments in housing are some of America's most economically secure citizens. For them, the nation's housing policies served as a foundation of their financial stability and the pathway

---

[25] *See, e.g., id.*; Sarah Ludwig, "Credit Scores in America Perpetuate Racial Injustice. Here's How," THE GUARDIAN (Oct. 13, 2015), https://www.theguardian.com/commentisfree/2015/oct/13/your-credit-score-is-racist-heres-why.

[26] Bartlett, *et al.*, "Consumer Lending Discrimination in the FinTech Era," 143 Journal of Financial Economics 1, 30-56 (2022), *available at* https://faculty.haas.berkeley.edu/morse/research/papers/discrim.pdf?_ga=2.22372220.679975626.1594361012-57417667.1594361012.

to future progress. Those who did not benefit from equitable federal investments in housing continue to be excluded. Algorithmic systems often have disproportionately negative effects on people and communities of color, particularly with respect to credit, because they reflect the dual credit market that resulted from our country's long history of discrimination. This risk is heightened by the aspects of AI/ML models that make them unique: the ability to use vast amounts of data, the ability to discover complex relationships between seemingly unrelated variables, and the fact that it can be difficult or impossible to understand how these models reach conclusions. Because models are trained on historical data that reflect and detect existing discriminatory patterns or biases, their outputs will reflect and perpetuate those same problems.[27]

55.     In other words, discrimination in lending remains a serious and well-known problem across the mortgage-lending industry, even where mortgage lenders use purportedly neutral algorithms to make lending decisions. However, the means to combat this discrimination exist.

**D.     Available Tools to Combat Discriminatory Lending.**

56.     There exists a vast array of policies, techniques, and technologies to identify, mitigate, and combat discrimination in lending.

57.     The NCUA—Navy Federal's regulator—has explained as much. It issued a Fair Lending Guide specifically for the credit unions that it regulates. According to the guide, Navy Federal and other credit unions should conduct internal or external audits to assess their compliance with the Fair Housing Act, ECOA and Regulation B on at least an annual basis.[28] Such compliance includes at least two discrete "tests": the "self-test," and the "effects test."

---

[27] Michael Akinwumi, *et al.*, "An AI fair lending policy agenda for the federal financial regulators," Brookings (Dec. 2, 2021), *available at* https://www.brookings.edu/articles/an-ai-fair-lending-policy-agenda-for-the-federal-financial-regulators/.

[28] NCUA Fair Lending Guide, at 15-16, 34-35 (July 2017), *available at* https://ncua.gov/files/publications/regulations/fair-lending-guide.pdf.

58.     According to the Interagency Fair Lending Examination Procedures manual, a "self-test is any program, practice or study that is designed and specifically used to assess the institution's compliance with the ECOA and the Fair Housing Act. It creates data or factual information that is not otherwise available and cannot be derived from loan, application or other records related to credit transactions."[29] As the NCUA Fair Lending Guide explains, the goal of the self-test is to allow a creditor to use demographic information—such as information regarding an applicant's race or gender—it collected in order "specifically to determine compliance with the ECOA."[30] This self-test is to be contrasted with a "self-evaluation," which is similar to a self-test, but "does not create any new data or factual information, [and rather] uses data readily available in loan or application files and other records used in credit transactions and, therefore, does not meet the self-test definition."

59.     Credit unions should also self-evaluate with respect to an "effects test."[31]

[An] 'effects test' refers to a credit practice that appears facially neutral, but has a disproportionately negative effect on a prohibited basis, even though the credit union may have no intent to discriminate. This type of practice is discriminatory, in effect, unless the credit union can demonstrate the practice meets a legitimate business need that cannot be reasonably achieved by means less disparate in impact.[32]

60.     Sophisticated financial institutions like Navy Federal, as a matter of course, employ people whose entire job is "model risk management;" *i.e.*, people whose position exists

---

[29] FDIC, "Interagency Fair Lending Examination Procedures – Appendix," at 4 (Aug. 2009), https://www.fdic.gov/regulations/examinations/fairlending/documents/interagency-fl-exam-procedures-appendix.pdf.

[30] NCUA Fair Lending Guide, *supra* note 28, at 7.

[31] FDIC Consumer Compliance Examination Manual, at IV-2.4 (Jan 12, 2024), *available at* https://www.fdic.gov/resources/supervision-and-examinations/consumer-compliance-examination-manual/index.html.

[32] NCUA Fair Lending Guide, *supra* note 28, at 8.

purportedly to analyze their automated systems to make sure those systems are not causing impermissible results.[33] Where there are disparate outcomes in their mortgage lending—even if their mortgage lending is influenced by a computer algorithmic "model"—companies like Navy Federal have the ability to analyze their own data to figure out why. Because of the robust public data sets available—including and especially the easily-accessible, and comprehensive, HMDA Data produced by the Consumer Financial Protection Bureau—they can compare their own data with that of other lenders.

61.     Moreover, as Consumer Reports succinctly put it, "[t]he technology now exists for lenders to identify less discriminatory underwriting models that do not sacrifice accuracy and predictiveness and lenders should be required to seek out these alternative models."[34] The technology allows the use of so-called big-data to determine credit risk scenarios using a variety of variables, in order to determine whether a lender is "overweighting" one variable vs. another, and thus causing a discriminatory impact that is easily avoidable.[35]

62.     But, despite its awareness of the mortgage discrimination problem in the mortgage lending industry, and despite its clear means to combat it, Navy Federal has chosen not to do so,

---

[33] Navy Federal has itself recently solicited new hires for its Model Risk Management team. Job Posting for Data Scientist (Model Risk Management) at Navy Federal Credit Union, https://www.salary.com/job/navy-federal-credit-union/data-scientist-model-risk-management/j202308290220564088996.

[34] Consumer Reports Press Release, "CR urges CFPB to investigate Navy Federal Credit Union for unfair mortgage lending and hold lenders using algorithmic scoring accountable for preventing discrimination," (Dec. 20, 2023), https://advocacy.consumerreports.org/press_release/cr-urges-cfpb-to-investigate-navy-federal-credit-union-for-unfair-mortgage-lending-and-hold-lenders-using-algorithmic-scoring-accountable-for-preventing-discrimination/.

[35] While lenders should be perfectly capable of performing this kind of analysis in house—particularly large lenders like Navy Federal—there also exist multiple companies, such as Fairplay.AI and FinregLab, who do this kind of consulting work.

and as shown below, engages in serious and systematic racial discrimination in lending, to the detriment of Plaintiffs and the other Class members.

**E.      Navy Federal's Mortgage Lending Program.**

63.      A core portion of Navy Federal's business is mortgage origination and underwriting. Mortgage origination and underwriting refers to the process by which lenders determine whether they view any risk incurred by offering a mortgage to a given borrower as "acceptable." Lenders may engage in underwriting by using a manual process (*i.e.*, a loan officer tasked with analyzing a borrower's likelihood of default and given discretion regarding whether to approve a given loan), through an automated process (*i.e.*, data from a borrower are fed into an algorithm, which then determines whether to offer a loan), or through a combination of the two.

64.      In response to media inquiries, Navy Federal has largely kept its underwriting process and formula a secret, but has indicated that it engages in a somewhat automated process. But no matter the case, a lender like Navy Federal will gather a host of information from any given borrower, including information regarding income, credit history, assets (liquid and illiquid), collateral available, and residency status. Indeed, Navy Federal requires every applicant to fill out a Uniform Residential Loan Application (Form 1003), that includes information about the applicant's name, SSN, citizenship, subject property address, property value, intended occupancy, former addresses, mailing addresses, employment information, income information, asset information, liabilities and expenses, and military service, all purportedly to help Navy Federal evaluate supposed risk. A number of these factors—in particular those relating to address/ZIP Code and former employment positions—can be proxies for race.[36]

---

[36] *See, e.g.*, Alexandra George, "Thwarting bias in AI systems," Carnegie Mellon College of Engineering (Dec. 11, 208), https://engineering.cmu.edu/news-events/news/2018/12/11-datta-

65.     According to its 2022 annual report, "Navy Federal closed almost 50,000 mortgage loans for a total of $16.5 billion" in 2022, and ended 2022 with a mortgage lending portfolio of $84.3 billion.[37] Residential loans underwritten by Navy Federal include first- and second-lien mortgages, mortgage refinancings, and Home Equity Lines of Credit, each of which relies on similar factors for the determination of an applicant's creditworthiness.

66.     In June 2019, Navy Federal hired a San Francisco startup called Blend to help to "automate" the application and lending process, creating a digital mortgage platform called the "HomeSquad."[38] Most, but not all, borrowers are now directed to use this platform to upload documents, communicate with loan officers, and receive lending decisions.

67.     While Navy Federal's process remains opaque, once Navy Federal has deemed an application complete, it runs the data from the application and other information—including information regarding credit score, which it calls on its website "a top factor"[39]—through its

---

proxies.html. ("Bias often appears in AI systems through factors like race or gender that aren't directly inputted into the system, but still have a strong influence on their decisions. Discrimination can happen when one of these attributes is strongly correlated with information that is directly used by the system. For example, suppose a system that makes decisions about credit uses ZIP Code as a factor to make its decisions. The direct information about race is not given to the system, but ZIP Code is strongly correlated with race since many neighborhoods are still segregated. By using ZIP Code, the system would be indirectly making decisions based on race. In this case, ZIP Code is a proxy for race.").

[37]     Navy     Federal     Annual     Report     (2022),
https://www.navyfederal.org/content/dam/nfculibs/pdfs/membership/2022-annual-report.pdf.

[38] Ben Lane, "Navy Federal launches digital mortgage platform with help from Blend," Housing Wire (June 24, 2019), https://www.housingwire.com/articles/49406-navy-federal-launches-digital-mortgage-platform-with-help-from-blend/.

[39] Navy Federal Website, "The Credit Score You Need to Buy a House" (Aug. 2, 2022), https://www.navyfederal.org/makingcents/home-ownership/credit-score-you-need-to-buy-a-house.html.

proprietary underwriting algorithm to determine a person's creditworthiness according to its model, and then decides whether to lend to a particular borrower and on what terms.

68. But whatever the specifics of its process, at Navy Federal, whether to lend to an individual and on what terms depends on the color of an applicant's skin.

**F. Navy Federal Engaged In Discriminatory Lending Practices.**

69. Navy Federal is one of the thousands of financial institutions required to submit mortgage lending data to the CFPB. Consistent with this requirement, Navy Federal submitted its 2018-2022 data, which was, in turn, published online by the CFPB.

70. In November 2022, the NCUA—Navy Federal's regulator—published disturbing research on "[m]ortgage [l]ending [d]isparities to [c]redit [u]nion [m]embers of [c]olor."[40] The study, by the NCUA's Office of Chief Economist, analyzed "data for credit union 30-year, fixed-rate loans."[41] Because Navy Federal is, by far, the largest[42] credit union in the United States, it accordingly dominates credit union mortgage lending, meaning that the data studied by the NCUA was necessarily dominated by Navy Federal loans.

71. The results were damning. The research "attempted to control for credit risk characteristics," *including* credit score and loan to value ratios, which were available to the study

---

[40] National Credit Union Administration Press Release, "NCUA Publishes Research Note on Mortgage Lending Disparities to Credit Union Members of Color" (Nov. 2, 2022), https://ncua.gov/newsroom/press-release/2022/harper-urges-credit-unions-embrace-fair-lending-and-diversity-equity-and-inclusion.

[41] *Id.*

[42] Navy Federal is approximately three times the size of the next-largest credit union, and approximately equal in size to credit unions sized 2-5 combined. *See* MX Blog, "Largest US Credit Unions by Asset Size (2023)," (Jan. 16, 2023), https://www.mx.com/blog/biggest-us-credit-unions-by-asset-size/.

authors.[43] It found that even taking credit score into consideration, in 2020 and 2021 minority applicants were denied mortgages at higher rates than similarly qualified White people—*up to 1.9 times higher*.[44]

 Observations on Credit Unions' Mortgage Lending to Minority Borrowers

## Appendix for Part 1

**Table 1: Relative Odds Ratios for Mortgage Denial (>1 means higher likelihood of mortgage application denial for minority group)**

| Product Type / Minority Group | Overall Mortgage Market 2020 (as Reported in Popick) | Credit Unions in 2020 (OCE estimate based on Popick Model) | Credit Unions in 2021 (OCE estimate based on Popick Model) |
|---|---|---|---|
| **Conventional, Purchase-Money Mortgages** | | | |
| Black | 1.61* | 1.62* | 1.60* |
| Hispanic | 1.41* | 1.18* | 1.55* |
| Asian | 1.65* | 1.28* | 1.60* |
| **Conventional, Rate-Term Refinances** | | | |
| Black | 1.66* | 1.94* | 1.54* |
| Hispanic | 1.35* | 1.38* | 1.32* |
| Asian | 1.37* | 1.53* | 1.57* |
| **Conventional, Cash-Out Refinances** | | | |
| Black | 1.58* | 1.89* | 1.81* |
| Hispanic | 1.28* | 1.40* | 1.45* |
| Asian | 1.46* | 1.84* | 1.50* |

\* - Significantly different from 1.0 at least at the 95% confidence level

72. Other research and analysis demonstrate that the discrimination problem is even *more* pronounced when Navy Federal is analyzed by itself.

73. In a statistical analysis performed by the organization The Markup, Navy Federal's 2019 HMDA Data showed that Navy Federal was *more than twice as likely* to deny Black

---

[43] NCUA Research Note, *supra* note 2, at 3.

[44] In other words, if 25% of White applicants were denied mortgages, 47.5% (or 1.9 x 25) of Black applicants were denied.

applicants who applied for mortgages, compared to White applicants, even when holding

seventeen independent variables constant.[45]

74.    The racial disparities found in Navy Federal's HDMA Data were not an anomaly.

A December 2023 analysis of Navy Federal's data by CNN found that:

> Navy Federal had statistically significant racial disparities in its mortgage approval
> rates while holding constant more than a dozen different variables including the
> applicant's income and debt-to-income ratio, the loan amount, the property value,
> and the neighborhood's socioeconomic makeup.
>
> Even among applicants who were identical among all those variables, the analysis
> found, Black applicants were more than twice as likely to be denied as White
> applicants, and Latino applicants were roughly 85% more likely to be denied than
> White applicants.[46]

75.     The HMDA Data clearly and unequivocally show that Navy Federal rejects a

disproportionate number of non-White applicants.

76.    According to Navy Federal's *own 2022 data*:

- Navy Federal denied African American home loan applications at a rate of 52%,

    while it only denied 23% of White applicants.[47]

- Navy Federal denied Latino home loan applications at a rate of 44%, while it

    only denied 23% of White applicants.[48]

---

[45] *See*, Emmanuel Martinez and Malena Carollo, "Dozens of Mortgage Lenders Showed
Significant Disparities. Here Are the Worst," The Markup (Aug. 25, 2021),
https://themarkup.org/denied/2021/08/25/dozens-of-mortgage-lenders-showed-significant-
disparities-here-are-the-worst.

[46] Casey Tolan *et al.*, "The nation's largest credit union rejected more than half of its Black
conventional mortgage applicants," CNN BUSINESS (Dec. 14, 2023),
https://www.cnn.com/2023/12/14/business/navy-federal-credit-union-black-applicants-
invs/index.html.

[47] *Id*.

[48] *Id*.

- Navy Federal denied Native American home loan applications at a rate of 36%, while it only denied 23% of White applicants.[49]

77.    In fact, an African American earning $140,000 or more per year had worse odds of being approved for a home loan by Navy Federal than a White applicant who only earned $61,000 or less, according to the 2022 data:



78.    The data from 2022 was no anomaly. Navy Federal's publicly reported HMDA Data from the years 2018-2021 show that its rejection of a disproportionate number of non-White applicants occurred during those years as well.

79.    Said differently, *Navy Federal's own data* reflect one clear and unmistakable conclusion:  Navy Federal—the nation' largest credit union, with over $165 billion in assets and

---

[49] *Id.*

13,000,000 members—systemically and intentionally discriminates against minority borrowers across the United States, and did so continuously throughout the Class Period.[50]

80.     As the data make clear, Navy Federal's discriminatory practices put it in a league of its own. For context, the following is a chart reflecting the racial gap between African American and White applicants at several major lenders, including Navy Federal:



81.     Navy Federal is, no doubt, aware that properly functioning financial institutions, including some of its competitors, correct for biases within underwriting processes by employing trained underwriters and fair lending teams to prevent systematic discrimination. It is not *inevitable* that poor White borrowers are approved at rates higher than wealthier Black borrowers. For some of Navy Federal's competitors, Black and White borrowers were approved at a rate within 3% of each other—a difference reflected in HMDA Data to which Navy Federal has ready access and about which it is certainly aware. Only Navy Federal had such a stark, 29% gap in 2022.

82.     Further, as noted above, the NCUA study of credit union mortgage discrimination *even took credit score into account* and still found statistically significant disparities in lending when analyzing a data set dominated by Navy Federal.[51]

---

[50] At a bare minimum, it is beyond dispute that the data shows a significant disparate impact in the mortgage application approval rates between White and non-White applicants. On information and belief, Navy Federal will not be able to demonstrate a lawful basis for this disparate impact.

[51] As also noted above in Paragraph 51, credit score has been shown to be an often weak indicator of actual creditworthiness that has had a disproportionately negative impact on non-White borrowers.

83.     Navy Federal has stated publicly that it engages in an at-least semi-automated underwriting process, characterized by a formula it refuses to share.[52] Navy Federal's implication is that, by dint of automation, it is not engaging in discrimination. That argument, however, is a red herring. As discussed above, "automation" is no guarantee of non-discrimination, as many factors—including, e.g., ZIP Code or other demographic information—could be proxies for race, and otherwise not aid a lender in determining risk. In other words, the variables used for its "automated" underwriting, and the weight those variables are given, is entirely up to Navy Federal. If those variables have a discriminatory impact—and as the data starkly show here, they do—that is up to Navy Federal as well.

## G.     Even When Navy Federal Approves Minority Applicants, It Charges Them More to Borrow than Similarly-Situated White Applicants.

84.     Navy Federal's discriminatory lending practices extend to unfair pricing as well.

85.     The NCUA Study found that when minority applicants *were* issued loans, the loans were more expensive than those of similarly qualified Whites by approximately ten basis points for Black borrowers and thirteen basis points for Hispanic borrowers.[53]  It bears repeating, the analysis controlled for "credit scores and loan-to value ratios."[54] The NCUA summarized the results in a chart:

---

[52] Casey Tolan *et al*., "The nation's largest credit union rejected more than half of its Black conventional mortgage applicants," CNN BUSINESS (Dec. 14, 2023), *supra* note 46.

[53] NCUA Research Note, *supra* note 2, at 3.

[54] *Id*.

**Table 2: Estimated Difference in Contract Interest Rates (reported in basis points; values >0 mean higher rate for minority group)**

| Product Type / Minority Group | Overall Mortgage Market 2020 (as Reported in Popick) | Credit Unions in 2020 (OCE estimate based on Popick Model) | Credit Unions in 2021 (OCE estimate based on Popick Model) |
|---|---|---|---|
| **Conventional, Purchase-Money Mortgages** | | | |
| Black | 6.1* | 10.3* | 7.5* |
| Hispanic | 6.4* | 10.4* | 12.9* |
| Asian | -5.4* | -4.2* | -2.8* |
| **Conventional, Rate-Term Refinances** | | | |
| Black | 1.9* | 3.1* | 1.7* |
| Hispanic | -0.1 | -0.0 | -0.7* |
| Asian | -5.3* | -3.1* | -3.6* |
| **Conventional, Cash-Out Refinances** | | | |
| Black | 4.4* | 6.4* | 1.9* |
| Hispanic | 1.0* | 1.0 | -0.3 |
| Asian | -3.7* | -2.1 | -2.4* |

\* - Significantly different from 0 at least at the 95% confidence level

86.     Navy Federal's own data show that this was also no anomaly. The publicly available HMDA Data showed that, from 2018 to the present, Navy Federal's Black and Latino home loan applicants have paid significantly higher interest rates than its White home loan applicants.

87.     Discrimination, however, is not a *fait accompli*. Opportunities for improvement abound. For example, Fannie Mae changed its policy to make clear that a borrower's rent payment history will be a significant factor in determining mortgage approval—a recent change that allowed 17% of loan applicants who otherwise would have been rejected to be approved for their mortgage loans.[55] While Navy Federal claims to take "rental history" into account, it has pointedly declined, in response to questioning from the press, to provide any details regarding how such history could

---

[55] The Real Deal, "Fannie Mae to count rent payments toward mortgage approval process" (Aug. 12, 2021), https://therealdeal.com/national/2021/08/12/fannie-mae-to-count-rent-payments-toward-mortgage-approval-process/.

impact its underwriting process. In other words, despite the public criticism that it faces, Navy Federal maintains secrecy over its residential loan algorithm.

88.     In any event, what *is* clear is that less discriminatory alternatives to Navy Federal's discriminatory practices exist. Other lenders employ underwriting algorithms and automated processes. Only Navy Federal has such a uniquely discriminatory result.

**H.     Navy Federal's Discrimination Harmed Plaintiffs and the Other Class Members.**

89.     Navy Federal's practices directly harmed non-White applicants—including Plaintiffs and the other Class members—by, among other things, preventing them from obtaining favorable loan terms in order to buy or refinance their homes at prevailing market rates, causing them to take out more costly loans (such as loans with higher interest rates or higher intendant loan costs), causing them to incur fees as part of multiple mortgage application processes, causing multiple hard credit pulls which harmed their credit, causing substantial inconvenience and distress, and/or by causing them to fail to obtain mortgages altogether.

90.     These practices were particularly impactful for applicants in the past several years.

91.     After a period of historically low mortgage rates, beginning in 2021, mortgage rates began a steady ascent. According to a study[56] by the St. Louis Federal Reserve Bank, on or about December 31, 2020, the average 30-year fixed rate mortgage interest rate was 2.67%. By November 2022 the average 30-year fixed rate had risen to 7.08%. As of November 30, 2023, the average rate was 7.22%.

---

[56] FRED Economic Data, "30-Year Fixed Rate Mortgage Average in the United States," Feb. 15, 2024, https://fred.stlouisfed.org/series/MORTGAGE30US.

92.     Navy Federal's denial of mortgages to minority applicants often denied those applicants the opportunity to take advantage of the period of historically low interest rates and kept many from attaining home ownership at all.

93.     These differences in interest rates can add up to hundreds of thousands of dollars— and, in some cases, millions of dollars—over the course of a home loan.

**I.      Navy Federal is Well Aware of Its Discriminatory Lending Practices.**

94.     Beyond its internal data, Navy Federal's discriminatory lending practices are demonstrated in its publicly available HMDA Data—a data set about which Navy Federal is well-aware. Indeed, the scrutiny on Navy Federal in 2023 is by no means the first time it has been made aware of its discrimination problem through the presentation of HMDA Data.

95.     A study by The Markup of 2019 Navy Federal HMDA Data described how Navy Federal was more than twice as likely to deny Black applicants' mortgage applications, when compared to White mortgage applicants.[57] In direct response to that study, Navy Federal stated that it "is committed to equal and equitable lending practices and strict adherence to all fair lending laws [,]" and that it is "proud of the lending work we do for all our members and does not believe this report accurately reflects our practices." What Navy Federal did *not* do in response to that study was actually improve its practices.

96.     Indeed, those practices have gotten worse. In 2019, the Black-White gap for mortgage loan approval for Navy Federal was approximately 13.5%, with 11.3% of White applicants being denied mortgages and 24.8% of Black applicants being denied. By 2022, the

---

[57] *See* Emmanuel Martinez and Malena Carollo, *Dozens of Mortgage Lenders Showed Significant Disparities. Here Are the Worst*, The Markup (Aug. 25, 2021), https://themarkup.org/denied/2021/08/25/dozens-of-mortgage-lenders-showed-significant-disparities-here-are-the-worst.

disparity had more than doubled, with White applicants being denied at 23%, and Black applicants being denied 52% of the time, a Black-White gap in mortgage approvals of 29%.

97.    On December 18, 2023, Navy Federal issued a press release responding to "allegations concerning its home lending practices." In that press release, Navy Federal claims that it takes "fair lending very seriously," and that the statistics in the CNN study "do not appear to have considered several key credit criteria." Unsurprisingly, Navy Federal does not name what those "unconsidered" criteria might be. Navy Federal also claims that it has committed to "drive further access to homeownership" within the communities it serves.

98.    But Navy Federal's words responding to a study of its 2022 lending practices—just like their words responding to a study of their 2019 lending practices—are entirely empty.

99.    Indeed, one need only look at the press release itself. At the bottom of the press release—as is present at the bottom of nearly every page on Navy Federal's website—is the following footer:



100.    Three items are remarkable about the footer. First, at the same time that Navy Federal states its wish to "drive further access to home ownership" within the communities it serves, Navy Federal reminds as a matter of course in the footer that it conducts "all member business in English," and that all materials, including "origination, servicing, collections, and marketing materials," are in "English only." Of course, given the 42 million people in the United

States who speak Spanish at home, other banks provide home-loan related services in that language as well.[58]

101.    Next, while Navy Federal claims in that same paragraph to be an "Equal Housing Lender"—providing a hyperlink with a small picture of a house purportedly to prove as much—Navy Federal cares so little for that "Equal Housing" that the hyperlink does not actually lead to information about "equal housing." Clicking the hyperlink on the press release instead lead to the automatic download of a Word document containing information regarding Navy Federal's "Cash Sweep Program,"[59] a program by which Navy Federal can move money into brokerage accounts:



SWEEP PROGRAM
GENERAL TERMS AND CONDITIONS

|
Our Cash Sweep Program
Navy Federal Investment Services ("NFIS," "we," or "our") through our clearing firm, Pershing, LLC ("Pershing") offers a cash sweep program ("Sweep Program") that automatically transfers or sweeps uninvested cash (free credit) balances in your brokerage account into a sweep product chosen specifically for your account type. Based on account type eligibility, you authorize and direct

102.    Finally, as for the statement on the footer that Navy Federal is an equal opportunity employer: that statement contains no hyperlink at all.

103.    Unfortunately, Navy Federal's disdain for its members cannot be a surprise. Navy Federal recently paid $28.6 million to settle claims of abuse against its military members.[60] When

---

[58] *See*, *e.g.*, Bank of America Website, "Home Loan Help," (Feb. 20, 2024), https://web.archive.org/web/20240220210150/https://homeloanhelp.bankofamerica.com/es/index.html.

[59] Navy Federal Press Release, "Navy Federal Credit Union Responds to Allegations Concerning Its Home Lending Practices," (Dec. 18, 2023), *accessible at* https://web.archive.org/web/20240113113042/https://www.navyfederal.org/about/press-releases/2023/navy-federal-responds-to-home-lending-allegations.html.

[60] CFPB Press Release, "CFPB Orders Navy Federal Credit Union to Pay $28.5 Million for Improper Debt Collection Actions," (Oct. 11, 2016), *accessible at*

its members purportedly owed Navy Federal debts, Navy Federal would illegally threaten wage garnishment. Cognizant that many of its members are in active service, Navy Federal made it a policy to threaten to report servicemembers' debts to the servicemembers' commanding officers. In reality, Navy Federal had no authorization to report such items up the so-called chain of command. Nevertheless, Navy Federal was aware that servicemembers could face disciplinary proceedings or revocation of their security clearances if they have serious credit problems, making the threats especially effective.[61]

104.    Far from serving its members, Navy Federal tried to turn its members' service against them.

105.    In short, harming its members and engaging in unlawful behavior is nothing new to Navy Federal, a company that has shown it simply does not care about equal housing, non-discrimination, or its members' well-being.

**J.      Plaintiffs Experienced Navy Federal's Illegal Conduct Firsthand.**

**Plaintiff Robert Otondi**

106.    Plaintiff Robert Otondi, who is African American, has been a Navy Federal member since approximately 2017.

107.    Plaintiff Otondi was eligible for a Navy Federal membership due to a referral from a relative who served in the military.

---

https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-navy-federal-credit-union-pay-285-million-improper-debt-collection-actions/.

[61] *Id.*

108.    Plaintiff Otondi emigrated to the United States from Kenya in 1998 to pursue a Master of Business Administration and has lived in Texas since 2007. He has two children—a daughter now attending college and a son in high school.

109.    Plaintiff Otondi applied for a loan with Navy Federal in June or July of 2021 to purchase a home in Grand Prairie, Texas. He hoped to purchase a home in Grand Prairie so that his son would be able to attend the high school of his choice there.

110.    At the time that he made his Navy Federal mortgage application, Plaintiff Otondi was the owner and operator of his own company offering logistics services and had an annual income of approximately $100,000.

111.    Plaintiff Otondi's credit score was above 700, and he had minimal outstanding debt obligations.

112.    Plaintiff Otondi was prepared to make a down payment that was more than 20 percent of the sales price of the home for which he sought the Navy Federal loan.

113.    Plaintiff Otondi was qualified for the loan he sought from Navy Federal.

114.    Despite this, when Plaintiff Otondi submitted a mortgage application to Navy Federal the application was denied.

115.    Plaintiff Otondi was surprised that Navy Federal denied his loan because he was more than qualified for the loan.

116.    Because of the denial, Plaintiff Otondi had to scramble to find alternate financing for the home. Otherwise, he would be unable to secure the home. He was stressed and bothered by the process.

117.    Plaintiff Otondi received approval for a mortgage from Service First Mortgage Company, and received a loan in August 2021 for the purchase of the same home.

118.    However, the Service First Mortgage loan was for a higher interest rate than the loan Plaintiff Otondi was qualified for at Navy Federal.

119.    Due to the higher interest rate, Plaintiff Otondi's monthly payments are more than they would have been with Navy Federal.

120.    Plaintiff Otondi continues to pay more in interest for the same home because of Navy Federal's racial discrimination. He remains upset regarding the experience with Navy Federal.

**Plaintiff Dennis Walker**

121.    Plaintiff Dennis Walker is an African American resident of Fort Lauderdale, Florida.  He has been a member of Navy Federal since approximately 2019.

122.    Plaintiff Walker was eligible for a Navy Federal membership because he is a disabled veteran of the United States Army and because he was employed by the United States Department of the Army.

123.    He is married and has four children and two stepchildren.

124.    Plaintiff Walker applied for a loan insured by the Veterans Administration ("VA Loan") with Navy Federal in December 2021, to refinance the mortgage on his home in Fort Lauderdale, Florida.

125.    He sought to refinance his mortgage with a "cash out" in order to perform needed home remodeling and repairs.

126.    At the time of application, Plaintiff Walker was working in logistics and procurement for the United States Department of the Army and had an annual income exceeding $100,000.

127.    Plaintiff Walker's credit score was above 620, as required for a VA loan.

36

128.    Plaintiff Walker was qualified for the refinance loan he sought from Navy Federal.

129.    Despite this, in January 2022, Navy Federal denied Plaintiff Walker's application.

130.    Plaintiff Walker was then forced to turn to other lenders.

131.    Plaintiff Walker received approval for a loan to refinance his mortgage from Liberty Loans in March 2022.

132.    However, the Liberty Loans loan was for a higher interest rate than the loan Plaintiff Walker was qualified for at Navy Federal.

133.    Due to the higher interest rate, Plaintiff Walker's monthly payments are higher than they would have been if Navy Federal had not denied his application for refinancing.

134.    As a result of Navy Federal's denial, Plaintiff Walker has experienced emotional distress, including acute stress, and monetary loss, including paying additional interest and other fees associated with the mortgage application.

**Plaintiff Constantina Batchelor**

135.    Plaintiff Constantina Batchelor, an African American resident of Glen Burnie, Maryland, originally became a Navy Federal member in 1989.

136.    She closed her account after relocating to Florida for college, and reestablished her relationship with Navy Federal in 2004.

137.    Plaintiff Batchelor was originally eligible for Navy Federal membership because she was employed by the United States Navy's Military Sea Lift Command.

138.    In November 2023, Plaintiff Batchelor applied for a mortgage loan to purchase a home in Glen Burnie, Maryland that she planned to make her primary residence.

139.    At the time of her application, Plaintiff Batchelor was employed by the Federal Emergency Management Agency. She earned more than $140,000 annually and had a credit score above 700.

140.    Plaintiff Batchelor was qualified for the loan that she sought from Navy Federal.

141.    In November 2023, Navy Federal conditionally approved her loan application.

142.    In December 2023, Plaintiff Batchelor closed on the loan with Navy Federal.

143.    Plaintiff Batchelor's loan with Navy Federal carries an 8% interest rate. This is 1% higher than the average prevailing rate in December 2023 for that same mortgage.[62]

144.    Upon information and belief, as described herein including, but not limited to paragraphs 84-86, the rate of interest on Plaintiff Batchelor's loan is higher than that of similarly situated, non-minority applicants.

145.    As a result, Plaintiff Batchelor has suffered and will continue to suffer economic and non-economic harm including emotional distress and monetary losses, including the payment of additional interest on her mortgage loan, and other costs associated with her home loan application.

**Plaintiff John Jackson**

146.    Plaintiff John Jackson, an African American resident of St. Augustine, Florida, has been a Navy Federal member since approximately 2023.

147.    Plaintiff Jackson was eligible for a Navy Federal membership through an invitation from a family member in the military.

---

[62]    Freddie    Mac    Website,    "Mortgage    Rates    Rise"    (Feb.    15,    2024), https://www.freddiemac.com/pmms.

148.     He is a father of two.

149.     In August 2023, Plaintiff Jackson applied for a mortgage loan with Navy Federal to purchase a home for his family in St. Augustine, Florida.

150.     At the time of application, Plaintiff Jackson was a Territory Medical Sales Manager with a credit score above 700.

151.     At the time of application, Plaintiff Jackson had approximately $290,000 of cash on hand and minimal outstanding debt obligations.

152.     Plaintiff Jackson was qualified for the loan that he sought from Navy Federal.

153.     Navy Federal preapproved him for a mortgage loan.

154.     After receiving the preapproval, Plaintiff Jackson made an offer on a home and the homeowner accepted his offer.

155.     Plaintiff Jackson was set to close on his dream home in early October 2023.

156.     Plaintiff Jackson incurred various expenses as part of his loan application process, including fees associated with a home inspection, credit report, and appraisal.

157.     Two weeks before the closing date, Navy Federal denied his application.

158.     Because of Navy Federal's eleventh-hour denial—following its preapproval—Plaintiff Jackson lost the opportunity to buy his dream home.

159.     Plaintiff Jackson, who had already sold his previous home, began looking for another home to purchase.

160.     He found a less desirable home to purchase and made an offer on that home. The home was less desirable, in part, because it was outside of his children's then-current school district.

161.     Because of the denial, Plaintiff Jackson was forced to turn to other lenders.

162.   Plaintiff Jackson received approval from Pulte Mortgage in September 2023.

163.   However, the loan Plaintiff Jackson obtained had a higher interest rate compared to the loan he was qualified for at Navy Federal.

164.   As a result of the denial, Plaintiff Jackson has experienced emotional distress, including stress and anxiety, and incurred monetary losses including paying additional interest, various fees as part of the  mortgage application, and an appraisal fee.

**Plaintiff Laquita Oliver**

165.   Plaintiff Laquita Oliver, who is African American, is a resident of Miami, Florida. Plaintiff Oliver has been a member of Navy Federal since approximately 2020.

166.   She is a married mother of two and a small business owner.

167.   Plaintiff Oliver applied for a mortgage loan with Navy Federal in August 2023, in order to purchase a home for her eldest daughter, who was about to complete her doctorate degree.

168.   At the time of application, Plaintiff Oliver was working as a Capital Improvement Project Analyst and had an annual income over $95,000, and her credit score was above 650.

169.   Plaintiff Oliver was qualified for the loan that she sought from Navy Federal.

170.   Despite this, Navy Federal denied Plaintiff Oliver's loan application in September 2023.

171.   Because of the denial, Plaintiff Oliver was not able to bid on a home for her daughter.

172.   As a result of the denial, Plaintiff Oliver experienced emotional distress, including shock, sadness, and monetary loss, including fees associated with the mortgage application. She has not since found a home to purchase for her daughter.

**Plaintiff Charles Gardner**

173.     Plaintiff Charles Gardner, an African American resident of Port Saint Lucie, Florida, and is about to complete his 22nd year of active service in the United States Navy.  He has been a Navy Federal member since at least 2012.

174.     In early 2023, while deployed in Japan, Plaintiff Gardner enrolled in a United States Navy program providing him an opportunity to work in the civilian world, while beginning to transition away from active military service.

175.     In anticipation of his return to the United States, Plaintiff Gardner began to search for a home to purchase.

176.     He turned to Navy Federal, with which he had a longstanding relationship, and because his relationship with the Navy engendered a feeling of trust.

177.     In the summer of 2023, Plaintiff Gardner identified a home that he wished to purchase: a new house being built in Port Saint Lucie, Florida.

178.     Plaintiff Gardner applied for a mortgage loan with Navy Federal in July 2023, in order to purchase the home.

179.     At the time of application, Plaintiff Gardner's credit score was approximately 800.

180.     At the time of application, between his salary and his non-taxed housing allowance from the military, Mr. Gardner earned approximately $92,000 per year. He also had ample cash on hand.

181.     Plaintiff Gardner was qualified for the loan that he applied for with Navy Federal.

182.     Navy Federal preapproved his loan application.

183.     Over the course of the summer and fall of 2023, while still deployed in Japan, Plaintiff Gardner was in regular communication with Navy Federal regarding his loan application.

184.    However, in late October 2023, weeks before closing on the home, Navy Federal denied his loan application.

185.    As a result of the denial, Plaintiff Gardner was shocked and afraid he would lose the house.

186.    Plaintiff Gardner was forced to turn to other lenders.

187.    He applied for and was approved for a mortgage loan with FBC Mortgage LLC. Absent Navy Federal's actions, on information and belief Plaintiff Gardner would have been able to lock in a lower mortgage rate than the one at which he ultimately closed.

188.    Plaintiff Gardner returned to the United States and closed on the home in November 2023. As a result of the denial, Plaintiff Gardner experienced emotional harm including shock and anxiety.  He had to engage in the entire process of securing a home loan while deployed in Japan, and found the process very stressful. Further, as a result of Navy Federal's actions, Mr. Gardner also experienced multiple hard pulls of his credit that on information and belief lowered his credit score.

**Plaintiff Carl Carr**

189.    Plaintiff Carl Carr, an African American resident of Greenville, North Carolina, has been a member of Navy Federal since approximately 1982.

190.    He was eligible for a Navy Federal membership because he had previously served in the United States Navy.

191.     Plaintiff Carr has been a letter carrier for the United States Postal Service for more than 35 years.

192.    In the fall of 2021, Plaintiff Carr and his spouse, who is also African American, were in the process of relocating from New Jersey to North Carolina. The Carrs rented a townhome in North Carolina while searching for a home to purchase.

193.    Navy Federal preapproved the Carrs for a mortgage loan in October 2021.

194.    In November 2021, the Carrs found their dream home in Greenville, North Carolina. They made an offer, which was accepted, and formally applied for a mortgage loan with Navy Federal.

195.    Specifically, Plaintiff Carr and his spouse applied for a VA Loan with Navy Federal.

196.    At the time of his application Plaintiff Carr and his spouse were both employed by the United States Postal Service. Together, they earned more than $130,000 annually.

197.    At the time of his application, the Carrs' credit scores were above 620, as required for a VA Loan, and he had minimal outstanding debt obligations consisting of minimal credit card debt and a car loan.

198.    Plaintiff Carr was qualified for the loan that he sought from Navy Federal.

199.    While his mortgage loan application was pending, Plaintiff Carr responded to various requests for additional information and documentation from Navy Federal.

200.    Due to delays in Navy Federal's processing of Plaintiff Carr's application, the closing date for the purchase of his home was delayed multiple times.

201.    In reliance on the conditional approval and further assurances he had received from Navy Federal, Plaintiff Carr did not renew the lease on his townhome, which was set to expire in April 2022.

202.    In January 2022, approximately two days before closing, Navy Federal informed Plaintiff Carr, without warning, that his application was denied.

203.    As a result, the seller of the home he had been intending to purchase would no longer sell the home to him. Mr. Carr wrote to Navy Federal in January 2022 saying he thought he had been discriminated against by them based on his race. Navy Federal said there was no "evidence of discrimination on file" and did not provide further assistance.

204.    After the denial, as their lease had expired, Plaintiff Carr and his spouse did not know where they would live.

205.    After continuing to search for a home, Plaintiff Carr and his spouse obtained a mortgage loan from Truist in September 2022 to purchase a more expensive home that was less desirable to them.

206.    The loan Plaintiff Carr received from Truist carried a higher rate of interest than the loan he was qualified for at Navy Federal.

207.    The delay and denial by Navy Federal caused Plaintiff Carr emotional distress including sadness and anxiety, and monetary losses including his earnest money deposit on his prospective home, higher interest payments, fees incurred as part of the application, and other monetary losses.

**Plaintiff Marie Pereda**

208.    Plaintiff Marie Pereda, a Hispanic/Latina resident of Temecula, California, has been a Navy Federal member since approximately 2019.

209.    Plaintiff Pereda was eligible for a Navy Federal membership because her husband had previously served in the United States Marine Corps.

210.    Plaintiff Pereda and her spouse have both been in the auto dealership business for over 30 years. They have one child together.

44

211.    In August 2022, Plaintiff Pereda and her spouse applied for a mortgage loan with Navy Federal to purchase a home in Murrieta, California.

212.    At the time of application, Plaintiff Pereda and her spouse earned several hundred thousand dollars per year, had credit scores above 650, and had minimal debt.

213.    Plaintiff Pereda was qualified for the loan that she sought from Navy Federal.

214.    Despite this, Navy Federal denied her mortgage application in August 2022.

215.    Because of the denial, Plaintiff Pereda was unable to buy the house for which she sought the loan.

216.    Plaintiff Pereda and her spouse continued to look for homes.

217.    In February 2023, Plaintiff Pereda applied for a mortgage with Shellpoint to purchase a different home in Temecula, California.

218.    Shellpoint approved Plaintiff Pereda and, in March 2023, she closed the loan and purchased the home.

219.    The loan Plaintiff Pereda received from Shellpoint carried a higher rate of interest than the loan she was qualified for at Navy Federal.

220.    In April 2023, Plaintiff Pereda applied to Navy Federal for a loan to refinance the mortgage loan she had obtained through Shellpoint.

221.    At the time of this application, Plaintiff Pereda and her spouse still earned several hundred thousand dollars per year, had credit scores above 650, and had minimal debt, aside from their existing mortgage loan.

222.    Plaintiff Pereda was qualified for the refinance loan she sought from Navy Federal.

223.    In May 2023, Navy Federal again denied Pereda's application.

224.    Plaintiff Pereda continues to pay interest on her mortgage at a higher rate than if her original application had been approved, or if her refinance application had been approved.

225.    As a result of the denials, Plaintiff Pereda experienced harm, including emotional distress, such as stress and anger, and monetary loss.

**Plaintiff Christina Hill**

226.    Plaintiff Christina Hill, who is African American, has been a member of Navy Federal since 1991.

227.    Plaintiff Hill was eligible for a Navy Federal membership because she is a disabled veteran of the United States Navy.

228.    Plaintiff Hill is married and has four children and two grandchildren.

229.    In September 2021, Plaintiff Hill applied for a cash out refinance loan with Navy Federal in order to make needed improvements to her home in San Diego, California.

230.    She chose to apply with Navy Federal because she had a longstanding relationship with Navy Federal, and because she had her auto loan with Navy Federal.

231.    Plaintiff Hill initiated her application online.

232.    At the time of her application, Plaintiff Hill was employed by the County of San Diego Health and Human Services Agency as a Case Investigator. She also received Veterans benefits and a retirement pension from the Department of Homeland Security.

233.    At the time of her application, Plaintiff Hill earned over $80,000 per year and had minimal debt obligations including her car loan with Navy Federal and under $10,000 in credit card debt.

234.    Plaintiff Hill was qualified for the loan she sought from Navy Federal.

235.    In October 2021, Navy Federal conditionally approved her application.

236.     While her application was pending, Plaintiff Hill responded to various requests from Navy Federal for additional information. She also requested the status of her application multiple times.

237.     In November 2021, Navy Federal suddenly denied her application.

238.     Because of the stress and anxiety that the application and denial caused her, Plaintiff Hill did not seek a cash out refinance loan with another lender.

239.     As a result of Navy Federal's unreasonable delay and denial, Plaintiff Hill experienced emotional distress, including stress, depression, and shock, and monetary loss, including the fees associated with the application process.

## V.     CLASS ACTION ALLEGATIONS

240.     Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and, as applicable, Rule 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

241.     Plaintiffs seek to represent the following class (the "Class"):

All minority residential loan applicants from 2018 through the present (the "Class Period") who submitted an application for any home mortgage loan to Defendant, who sought to refinance or modify a home mortgage loan through Defendant, and/or who sought a Home Equity Line of Credit from Defendant and whose application was:  (a) denied; (b) approved at higher interest rates and/or subject to less favorable terms as compared to similarly situated non-minority applicants; or (c) processed at a rate slower than the average processing time of applicants submitted by similarly situated non-minority applicants.

242.     In addition, Plaintiffs Walker, Jackson, Oliver, and Gardner seek to represent the following "Florida Subclass":

All Florida-resident, minority residential loan applicants from 2018 through the present (the "Class Period") who submitted an application for any home mortgage loan to Defendant, who sought to refinance or modify a home mortgage loan through Defendant, and/or who sought a Home Equity Line of Credit from Defendant and whose application was:  (a) denied; (b) approved at higher interest

rates and/or subject to less favorable terms as compared to similarly situated non-minority applicants; or (c) processed at a rate slower than the average processing time of applicants submitted by similarly situated non-minority applicants.

243.    In addition, Plaintiffs Pereda and Hill seek to represent the following "California Subclass":

All California-resident, minority residential loan applicants from 2018 through the present (the "Class Period") who submitted an application for any home mortgage loan to Defendant, who sought to refinance or modify a home mortgage loan through Defendant, and/or who sought a Home Equity Line of Credit from Defendant and whose application was:  (a) denied; (b) approved at higher interest rates and/or subject to less favorable terms as compared to similarly situated non-minority applicants; or (c) processed at a rate slower than the average processing time of applicants submitted by similarly situated non-minority applicants.

244.    Plaintiffs reserve the right to amend the Class definitions and/or seek certification of further classes or subclasses based on race, ethnicity, or the type of transactions at issue (e.g., original purchase mortgage loans, refinancings, and/or HELOCs).

245.    Excluded from the Class are Defendant, and any of Defendant's affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.

246.    Navy Federal fraudulently concealed from Plaintiffs and other Class members that it engages in racial discrimination in its mortgage lending business. Navy Federal has been aware that it engages in discrimination in lending and is uniquely knowledgeable about its own discriminatory actions, but did not reveal to the Plaintiffs in any communication that it engages in such discrimination. On the contrary, Navy Federal repeatedly claimed that it was an "Equal Housing Lender."[63]

---

[63]           Navy           Federal           Website           (Feb.           5,           2024), https://web.archive.org/web/20240205105424/https://www.navyfederal.org/.

247.   This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

248.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Plaintiffs are informed and believe that, based on Defendant's share of the residential home loan market, there are thousands of Class members. The precise number of Class members is presently unknown to Plaintiffs but may be ascertained from Defendant's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

249.   **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Defendant has acted in a manner generally applicable to Plaintiffs and each of the other members of the proposed Class. There is a well-defined community of interest in the questions of law and fact involved, which affect all Class members. The questions of law and fact common to the Class predominate over the questions that may affect individual Class members, including, among others:

  a.   Whether Defendant systematically discriminated against Class members based upon their minority status;

  b.   Whether Class members' applications for a first or second lien mortgage were denied where similarly situated non-minority applicants were approved;

  c.   Whether Class members' applications to refinance a first or second lien loan were denied where similarly situated non-minority applicants were approved;

d.  Whether Class members' applications for a Home Equity Line of Credit were denied where similarly situated non-minority applicants were approved;

e.  Whether home loans granted to Class members were granted on terms less desirable than the terms given to similarly situated non-minority applicants;

f.  Whether Navy Federal's underwriting algorithms or machine learning programs were racially biased and led to unfairly discriminatory credit policies that harmed minority applicants;

g.  Whether the disparate impact of Navy Federal's policies was known to Navy Federal during the relevant time period, leading to the uniform disparate treatment of minority applicants;

h.  Whether Class members' residential loan applicants were processed at a rate slower than the average processing time for applicants submitted by non-minority applicants;

i.  Whether Navy Federal's consumer disclosures were inadequate;

j.  Whether Navy Federal failed to make relevant and material statements regarding its underwriting practices to consumers who sought home loans with Navy Federal;

k.  Whether Navy Federal's internal approval processes are or were discriminatory;

l.  Whether Navy Federal's appraisal policies are or were discriminatory;

m.  Whether Navy Federal's discriminatory conduct was undertaken with actual malice, and/or Navy Federal was so reckless or negligent to the impact of its action as to show a conscious disregard of Plaintiffs' federally- and/or state-guaranteed rights;

50

n.  Whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, punitive damages, exemplary damages, and/or other relief; and

o.  The amount and nature of relief to be awarded to Plaintiffs and the other Class members.

250.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the other Class Members' claims because Plaintiffs and the other Class Members were subjected to the same allegedly unlawful conduct by Defendant and damaged in the same way. Plaintiffs and the other Class Members suffered damages as a direct proximate result of the same wrongful practices in which Defendant engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class Members' claims.

251.  **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

252.  **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for the members of the Class to

individually seek redress for Defendant's wrongful conduct.  Even if Class members could afford individual litigation, such litigation creates a potential for inconsistent or contradictory judgments. It increases the delay and expense to all parties and the court system.  By contrast, a class action is suited and intended to manage such difficulties and provide the benefits of uniform and common adjudication, economy of scale, and comprehensive supervision.

253.   **Declaratory And Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making declaratory relief appropriate, with respect to each Class as a whole. Plaintiffs also seek to represent the Class under Rule 23(b)(2) to obtain final injunctive relief forcing Navy Federal to cease and desist its current discriminatory practices.

254.   **Issue Certification – Federal Rule of Civil Procedure 23(c)(4).** As an alternative to Rule 23(b)(2) and/or 23(b)(3), Plaintiffs seek issue certification under Rule 23(c)(4) of liability issues common to all Class members.

## VI.   CLAIMS FOR RELIEF

### COUNT ONE
### RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT OF 1968, 42 U.S.C. § 3601, *et seq.*

255.   Plaintiffs, individually and on behalf of all others similarly situated, incorporate by reference Paragraphs 1–254, as though fully realleged herein.

256.   The Fair Housing Act makes it unlawful to discriminate against designated classes of individuals in residential real estate transactions, including residential lending.

257.   Plaintiffs and the other Class members sought to obtain loans for real estate purchases or refinancings with Navy Federal.

258.    Plaintiffs and the other Class members are members of a protected class under the Fair Housing Act.

259.    In violation of the Fair Housing Act, Navy Federal discriminated against Plaintiffs and each of the other Class members by denying and delaying their residential loan applications—including mortgages, refinancing transactions, and HELOCs—while granting said residential loan applications for similarly-situated White applicants.

260.    Navy Federal further discriminated against Plaintiffs and the other Class members, even when Navy Federal approved a loan, by offering less favorable loan terms—such as loans characterized by higher interest rates, costs, or fees—than those loans offered to similarly situated White applicants.

261.    Navy Federal was aware that it was engaging in a pattern and practice of discrimination in home loans, and it nevertheless persisted in engaging in such discrimination. In other words, Navy Federal's discriminatory conduct was undertaken with actual malice, and/or Navy Federal was so reckless or negligent to the impact of its action as to show a conscious disregard of Plaintiffs' federally guaranteed rights.

262.    Plaintiffs and the other Class members were injured by Navy Federal's violation of the Fair Housing Act. As a result of Navy Federal's behavior, and without limitation, Plaintiffs experienced race-based discrimination, paid costs and fees associated with residential loan applications that were improperly delayed or denied, continued to pay higher interest rates, lost out on opportunities for homes they otherwise would have been able to purchase, experienced damage to their credit due to the "hard pulls" required by their Navy Federal loan applications, took out more costly loans with Navy Federal, such as loans with higher rates and/or higher

intendant loan costs than those offered to similarly situated non-minority applicants, and/or were forced to take out more costly loans with other lenders elsewhere due to Navy Federal's actions.

263.    As a result of the foregoing, Plaintiffs, individually and on behalf of the other Class members, request the relief set forth below.

**COUNT TWO**
**RACE DISCRIMINATION IN VIOLATION OF THE**
**EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691, *et seq.***

264.    Plaintiffs, individually and on behalf of all others similarly situated, incorporate by reference Paragraphs 1–254, as though fully realleged herein.

265.    The Equal Credit Opportunity Act makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction. . . on the basis of race, color, [or] national origin."

266.    The Equal Credit Opportunity Act applies to applications for residential loans for original purchase mortgages and mortgage refinancing, along with credit provided through Home Equity Lines of Credit, like those of the Plaintiffs and others similarly situated.

267.    Plaintiffs and the other Class members are "aggrieved applicants" under the meaning of that term in 15 U.S.C. § 1691e(a).

268.    Plaintiffs and the other Class members applied for credit by seeking to finance their home purchases, refinance their existing home loans, or for HELOCs.

269.    Plaintiffs and the other Class members were qualified for the residential mortgages (including refinancing and/or HELOCs) that they sought from Navy Federal.

270.    Plaintiffs and each of the other Class members made such applications to Navy Federal.

271.    Navy Federal is a creditor within the meaning of the Equal Credit Opportunity Act because it regularly extends, renews, and continues issuances of credit.

272.     Navy Federal violated the Equal Credit Opportunity Act by discriminating against Plaintiffs and other Class members based on their race.

273.     Navy Federal denied and/or delayed Plaintiffs' and the other Class members' mortgage applications because of their race while timely processing and approving mortgages (including refinancing and/or HELOCs) for similarly situated White applicants.

274.     Navy Federal further discriminated against Plaintiffs and the other Class members, even when Navy Federal approved a loan, by offering less favorable loan terms—such as loans characterized by higher interest rates, costs, or fees—than those loans offered to similarly situated White applicants.

275.     Plaintiffs and the other Class members were injured by Navy Federal's violation of the Equal Credit Reporting Act. As a result of Navy Federal's behavior, and without limitation, Plaintiffs experienced race-based discrimination, paid costs and fees associated with residential loan applications that were improperly delayed or denied, continued to pay higher interest rates, lost out on opportunities for homes they otherwise would have been able to purchase, experienced damage to their credit due to the "hard pulls" required by their Navy Federal loan applications, took out more costly loans with Navy Federal, such as loans with higher rates and/or higher intendant loan costs than those offered to similarly situated non-minority applicants, and/or were forced to take out more costly loans with other lenders elsewhere due to Navy Federal's actions.

276.     As a result of the foregoing, Plaintiffs, individually and on behalf of the other Class members, request the relief set forth below.

## COUNT THREE
## RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

277.     Plaintiffs, individually and on behalf of all others similarly situated, incorporate by reference Paragraphs 1–254, as though fully realleged herein.

278.    Under 42 U.S.C. § 1981, persons are guaranteed the same right to make and enforce contracts, regardless of race. The phrase "make and enforce" contracts includes the making, performance, modification, and termination of contracts, as well as "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

279.    By seeking residential home loans including mortgages, refinances, and/or HELOCs from Navy Federal, Plaintiffs and the other Class members sought to "make and enforce" contracts with Navy Federal. Plaintiffs and the other Class members were denied their right to make and enforce contracts on the basis of their race when Navy Federal improperly denied their loan applications, delayed or frustrated the application process, or offered to them terms less favorable than those offered to non-minority applicants.

280.    Navy Federal is aware that is engages in in a pattern and practice of intentional discrimination in violation of Federal law, and nevertheless continues to engage in such pattern and practice of discrimination.

281.    Plaintiffs and the other Class members were harmed by Navy Federal's denial of their rights to make and enforce contracts. As a result of Navy Federal's behavior, and without limitation, Plaintiffs experienced race-based discrimination, paid costs and fees associated with residential loan applications that were improperly delayed or denied, continued to pay higher interest rates, lost out on opportunities for homes they otherwise would have been able to purchase, experienced damage to their credit due to the "hard pulls" required by their Navy Federal loan applications, took out more costly loans with Navy Federal, such as loans with higher rates and/or higher intendant loan costs than those offered to similarly situated non-minority applicants, and/or were forced to take out more costly loans with other lenders elsewhere due to Navy Federal's actions.

282.   As a result of the foregoing, Plaintiffs, individually and on behalf of the other Class members, request the relief set forth below.

## COUNT FOUR
## DECLARATORY JUDGMENT, 28 U.S.C. § 2201

283.   Plaintiffs, individually and on behalf of all others similarly situated, incorporate by reference Paragraphs 1–254, as though fully realleged herein.

284.   The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

285.   As alleged above, Plaintiffs and the Class seek a declaration that Navy Federal unlawfully discriminates in mortgage lending.

286.   An actual, present, and justiciable controversy has arisen between Plaintiffs and the Class on the one hand and Navy Federal on the other hand, concerning Navy Federal's practices.

287.   Plaintiffs and the Class seek declaratory judgment from this Court that Navy Federal's mortgage lending practices violate 42 U.S.C. § 3601, *et seq.*, 42 U.S.C. § 1981, and 15 U.S.C. §§ 1691, *et seq.*

**COUNT FIVE**
**VIOLATION OF THE UNRUH CIVIL RIGHTS ACT**
**CALIFORNIA CIVIL CODE § 51**
**(Plaintiffs Pereda and Hill on behalf of themselves and the California Subclass)**

288.   Plaintiffs Pereda and Hill ("Plaintiffs" for the purposes of Count Five), individually and on behalf of all others similarly situated in the California Subclass, incorporate by reference Paragraphs 1–254, as though fully realleged herein.

289.   The Unruh Civil Rights Act declares that all people of the State of California "are free and equal," and forbids discrimination of any kind by business establishments based on protected characteristics, such as race, color, ancestry, and national origin.

290.   Navy Federal is a business establishment subject to the Unruh Civil Rights Act as it has physical branches and conducts business with its members within the State of California.

291.   Plaintiffs and other California Subclass members were denied full and equal treatment as required under the Unruh Civil Rights Act when Navy Federal intentionally discriminated against Plaintiffs and each of the other California Subclass members by denying their residential loan applications—including mortgages, refinancing transactions, and HELOCs—while granting said residential loan applications for similarly-situated White applicants.

292.   Navy Federal further denied Plaintiffs and other California Subclass members full and equal treatment as required under the Unruh Civil Rights Act when it intentionally discriminated against them by offering them less favorable loan terms, such as loans characterized by higher interest rates, costs, or fees than the loans offered to similarly situated non-minority applicants.

293.   Navy Federal was aware that it was engaging in a pattern and practice of intentional discrimination in home loans, and it nevertheless persisted in engaging in such discrimination. In other words, Navy Federal's discriminatory conduct was undertaken with actual malice, and/or

Navy Federal was so reckless or negligent to the impact of its action as to show a conscious disregard of Plaintiffs' and other California Subclass members' civil rights guaranteed by the Unruh Civil Rights Act.

294.    Plaintiffs and other California Subclass members were injured by Navy Federal's discriminatory conduct in violation of the Unruh Civil Rights Act. As a result of Navy Federal's behavior, and without limitation, Plaintiffs experienced race-based discrimination, paid costs and fees associated with residential loan applications that were improperly delayed or denied, continued to pay higher interest rates, lost out on opportunities for homes they otherwise would have been able to purchase, experienced damage to their credit due to the "hard pulls" required by their Navy Federal loan applications, took out more costly loans with Navy Federal, such as loans with higher rates and/or higher intendant loan costs than those offered to similarly situated non-minority applicants, and/or were forced to take out more costly loans with other lenders elsewhere due to Navy Federal's actions.

295.    As a result of the foregoing, Plaintiffs, individually and on behalf of the other California Subclass members, request the relief set forth below.

**COUNT SIX**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200**
**(Plaintiffs Pereda and Hill on behalf of themselves and the California Subclass)**

296.    Plaintiffs Pereda and Hill ("Plaintiffs" for the purposes of Count Six), individually and on behalf of all others similarly situated in the California Subclass, incorporate by reference Paragraphs 1–254, as though fully realleged herein.

297.    The California Unfair Competition Law "UCL" forbids an "unfair competition" which is defined include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

298.     Navy Federal is a "person" within the UCL's definition, which includes any "natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." Cal. Bus. & Prof. Code § 17201.

299.     Navy Federal's mortgage lending business is a business activity under the UCL.

**Unlawful Prong**

300.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

301.     Navy Federal's conduct violates the Fair Housing Act, the ECOA, 42 U.S.C. § 1981, and the Unruh Civil Rights Act, as described herein. These violations are sufficient to support Plaintiffs' and the other California Subclass members' claims under the UCL's "unlawful" prong.

**Unfair Prong**

302.     In addition, a business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

303.     Navy Federal's actions constitute "unfair" business practices because, as alleged above, Navy Federal engaged in the immoral, unethical, oppressive, and unscrupulous practice of discrimination against Plaintiffs and other California Subclass members on the basis of their race with regards to its residential mortgage origination and lending business. Such discriminatory practices are extremely harmful to the public, and serve no utility to the public, consumers, or competition.

304.     Moreover, Navy Federal's discriminatory lending practices directly contradicted its claims that it was committed to and engaged in fair lending practices.

305.    As a result of the above conduct, Plaintiffs and the California Subclass members suffered economic injury, and Navy Federal has been unjustly enriched at the expense of Plaintiffs and other members of the California Subclass. Navy Federal has been unjustly enriched by obtaining revenues and profits that it would not have obtained otherwise absent its unlawful conduct. Through its unlawful acts and practices, Navy Federal has improperly obtained money from Plaintiffs and the California Subclass members. As such, Plaintiffs request that the Court cause Navy Federal to restore the money to Plaintiffs and the California Subclass members, including through restitution and restitutionary disgorgement, and enjoin Navy Federal from continuing to violate the UCL in the future. Absent an injunction, Plaintiff and the California Subclass members may be irreparably harmed and/or denied an effective and complete remedy. The California Subclass's allegations under the UCL are presently for equitable relief, including injunctive relief and restitution; however, the California Subclass maintains the right to amend at a later time to add additional damages claim(s) under the UCL.

### COUNT 7
### VIOLATION OF SECTION 725.07, FLORIDA STATUTES
**(Plaintiffs Walker, Jackson, Oliver, and Gardner on behalf of themselves and the Florida Subclass)**

306.    Plaintiffs Walker, Jackson, Oliver, and Gardner ("Plaintiffs" for the purposes of Count 7), individually and on behalf of all others similarly situated in the Florida Subclass, incorporate by reference Paragraphs 1–254, as though fully realleged herein.

307.    Section 725.07, Florida Statutes, prohibits discrimination against any person based on race in the areas of loaning money and granting credit.

308.    Navy Federal is subject to liability under Section 725.07 because it transacts business within the state of Florida with Florida residents.

61

309.     As described above, Navy Federal violated Plaintiffs' and the other members of the Florida Subclass's rights under Section 725.07, when it discriminated against them based on their race by offering them terms less favorable than those offered to non-minority applicants, delayed or frustrated their application process, and/or by improperly denying their applications.

310.     The discriminatory conduct of Navy Federal and its agents proximately, directly, and foreseeably injured Plaintiffs and the other members of the Florida Subclass. As a result of Navy Federal's behavior, and without limitation, Plaintiffs experienced race-based discrimination, paid costs and fees associated with residential loan applications that were improperly delayed or denied, continued to pay higher interest rates, lost out on opportunities for homes they otherwise would have been able to purchase, experienced damage to their credit due to the "hard pulls" required by their Navy Federal loan applications, took out more costly loans with Navy Federal, such as loans with higher rates and/or higher intendant loan costs than those offered to similarly situated non-minority applicants, and/or were forced to take out more costly loans with other lenders elsewhere due to Navy Federal's actions.

311.     Navy Federal's conduct was willful and wanton, and in reckless disregard for the statutory rights of Plaintiffs and the other members of the Florida Subclass.

312.     As a result of the foregoing, Plaintiffs, individually and on behalf of the other Florida Subclass members, request the relief set forth below.

## VII.   <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of the other Class and (as applicable) Subclass members, respectfully request that the Court enter judgement in their favor and against Defendant, Navy Federal Credit Union, as follows:

A.      Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives (and Subclass representatives as applicable), and appointing Plaintiffs' Interim Co-Lead Class Counsel as Class Counsel;

B.      Finding that Defendant's acts described herein violate the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, the Unruh Civil Rights Act; the California Unfair Competition Law, and Section 725.07, Florida Statutes;

C.      Awarding Plaintiffs and each of the other Class members restitutionary relief, as well as compensatory, statutory, and punitive damages;

D.      Ordering Navy Federal to reform loans and/or extend loans to minority applicants on the same terms afforded to non-minority applicants;

E.      Awarding Plaintiffs and each of the other Class members injunctive and equitable relief;

F.      Awarding Plaintiffs and each of the other Class members prejudgment interest and attorneys' fees, costs, and disbursements; and

G.      Award Plaintiffs and each of the other Class members such other and further relief as this Court deems just and proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated:  February 20, 2024                    Respectfully submitted,


/s/ F. Peter Silva II[64]                        /s/ Adam J. Levitt
F. Peter Silva, II (State Bar No. 80935)      Adam J. Levitt (*pro hac vice*)
**TYCKO & ZAVAREEI LLP**                      **DICELLO LEVITT LLP**
2000 Pennsylvania Ave., NW, Suite 1010        Ten North Dearborn Street, Sixth Floor
Washington, District of Columbia 20006        Chicago, Illinois 60602
Telephone: 202-973-0900                       Telephone:  312-214 7900
Facsimile: 202-973-0950                        alevitt@dicellolevitt.com
psilva@tzlegal.com

Ben Crump (*pro hac vice*)                     Hassan Zavareei (*pro hac vice*)
**BEN CRUMP LAW PLLC**                        **TYCKO & ZAVAREEI LLP**
122 South Calhoun Street                       2000 Pennsylvania Ave., NW, Suite 1010
Tallahassee, Florida 32301                     Washington, District of Columbia 20006
Telephone:  850-224-2020                       Telephone: 202-973-0900
ben@bencrump.com                               Facsimile: 202-973-0950
                                               hzavareei@tzlegal.com


**Interim Co-Lead Class Counsel for Plaintiffs and the Proposed Class**

Daniel R. Schwartz (*pro hac vice*)           Diandra Debrosse Zimmermann (*pro hac vice*)
**DICELLO LEVITT LLP**                        Eli Hare (*pro hac vice*)
Ten North Dearborn Street, Sixth Floor         **DICELLO LEVITT LLP**
Chicago, Illinois 60602                        505 20th Street North, 15th Floor
Telephone:  312-214 7900                       Birmingham, Alabama 35203
dschwartz@dicellolevitt.com                    Telephone: 205-855-5700
                                               fu@dicellolevitt.com
                                               ehare@dicellolevitt.com


Éviealle Dawkins (*pro hac vice*)              Sue-Ann Robinson (*pro hac vice*)
**DICELLO LEVITT LLP**                        Chris O'Neal (*pro hac vice forthcoming*)
1101 17th Street NW, Suite 1000                Natalie Jackson (*pro hac vice forthcoming*)
Washington, DC  20036                          Nabeha Shaer (*pro hac vice forthcoming*)

---

[64] Additional Counsel for Plaintiffs and the Proposed Class. Attorney Silva has not been appointed Interim Co-Lead Class Counsel for Plaintiffs and Proposed Class. His signature appears here as the filing user in compliance with Chapter 3 of the E-Filing Policies and Procedures Manual for the United States District Court for the Eastern District of Virginia.

Telephone:  202-975-2288
edawkins@dicellolevitt.com

Desiree Austin-Holliday (*pro hac vice forthcoming*)
**BEN CRUMP LAW PLLC**
122 South Calhoun Street
Tallahassee, Florida 32301
Telephone:  850-224-2020
sueann@bencrump.com
chris@bencrump.com
natalie@bencrump.com
nabeha@bencrump.com
desiree@bencrump.com

Andrea Gold (*pro hac vice*)
Glenn Chappell (State Bar No. 92153)
Shana Khader (*pro hac vice forthcoming*)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave., NW, Suite 1010
Washington, DC 20006
Telephone: 202-973-0900
Facsimile: 202-973-0950
agold@tzlegal.com
gchappell@tzlegal.com
skhader@tzlegal.com

Wesley M. Griffith (*pro hac vice*)
Cort Carlson (*pro hac vice*)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: 510-254-6808
Facsimile: 202-973-0950
wgriffith@tzlegal.com
carlson@tzlegal.com

Daniel K. Bryson (*pro hac vice forthcoming*)
Scott Harris (*pro hac vice*)
Michael Dunn (*pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
900 West Morgan Street
Raleigh, North Carolina 27603
Telephone: 919-600-5000
dbryson@milberg.com
sharris@milberg.com
michael.dunn@milberg.com

Glen L. Abramson (*pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
800 South Gay Street, Suite 1100
Knoxville, Tennessee 37929
Telephone:  866-252-0878
gabramson@milberg.com

John P. Pierce (State Bar No. 43404)
**LILES PARKER PLLC**
2305 Calvert Street, NW
Washington, DC  20008
Telephone:  202-567-2050
jpierce@lilesparker.com

Jonathan M. Petty, (State Bar No. 43100)
Christopher P. Yakubisin, (State Bar No. 91186)
**PHELAN PETTY PLC**
3315 West Broad Street
Richmond, Virginia 23230
Telephone:  804-980-7100
jpetty@phelanpetty.com

**Additional Counsel for Plaintiffs and the Proposed Class**